UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA    )
                     )
          v.            )    No. 5:18-cr-61-1-2
                     )
SAM BENT and           )
DJENEBA BENT,          )
    Defendants.      )

## DEFENDANT'S MOTION TO SUPPRESS AND REQUEST FOR *FRANKS* HEARING

NOW COMES Defendant, Sam Bent, by and through counsel, Stephanie M. Greenlees, Esq. of KAPLAN AND KAPLAN, and, pursuant to the Fifth and Fourteenth Amendments, hereby moves for an order suppressing evidence of and derived from and/or pursuant to the March 29, 2018 extended border search; show-up identifications of co-defendant; April 3, April 10 and April 17, 2018 search warrants; and Defendant's confession and consents to search. Defendant further requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## MEMORANDUM

**I.   Background**

On May 24, 2018, Defendant Sam Bent was indicted on ten counts: (1) knowingly and willfully conspiring with co-defendant Djeneba Bent to possess and distribute cocaine, LSD, MDMA and marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) knowingly and intentionally possessing with intent to distribute LSD on April 10, 2018 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C); (3) knowingly and intentionally possessing with intent to distribute MDMA on April 10, 2018; (4) knowingly and intentionally possessing with intent to distribute LSD on April 3, 2018; (5) knowingly and intentionally possessing with intent to distribute MDMA on April 3, 2018; (6) knowingly and intentionally possessing with intent to distribute cocaine on April 3, 2018; (7)-(9) knowingly conducted financial transactions affecting interstate and foreign commerce which involved the proceeds of unlawful conduct in violation of 21 U.S.C. §846 on September 27, 2018, October 10, 2017 and January 16, 2018, knowing that the transactions were designed to conceal and disguise the proceeds of said specified unlawful activity in violation of 18 U.S.C. §1956; and (10) knowingly engaged and attempted to engage in monetary transactions affecting interstate or foreign commerce, in criminally transferring and



PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

exchanging funds of a value greater than $10,000 and deriving such funds from conduct in violation of 21 U.S.C.§846 through U.S. mail on October 10, 2017 in violation 18 U.S.C. §1957.

The instant charges resulted from an investigation lead by Homeland Security Investigations ("HSI") Agent Jamie West and U.S. Postal Inspector Jonathan Dunham. The investigation centered on the user of screenname "2Happytimes2" suspected distribution of narcotics illegally over the darkweb.  The government has produced evidence alleging (1) communications with local post offices primarily between March 23 - 29, 2018 concerning P.O. 22 at the East Burke Vermont Post Office ("P.O. Box 22), which is registered to Tracy Baker at 3585 Darling Hill Road, East Burke and also lists Sammy Bent and three other individuals as authorized to accept mail; (2) P.O. Box 22 received/mailed a large amount of parcels and co-defendant mailed/received  parcels at East Burke and other Post Offices in Northern Vermont; (3) two separate United States Postal Service ("USPS") employees identifying co-defendant in a single photo showup on March 26, 2018 and on March 27, 2018, and agents distribution subsequent distribution of her photo to Post Offices in Northern Vermont which lead to the seizure of parcels mailed by co-defendant; (4) March 29, 2018 seizure of six parcels after a Danville Post Office clerk identified co-defendant (from the photo distributed) as the mailer and which lead to search of said parcels pursuant to a search warrant dated April 3, 2018 and recovery of controlled substances; (4) March 29, 2018 extended border search of two parcels mailed from Spain to Sam Bent at P.O. Box 22 and suspected to, but did not lab test positive for heroin; (5) search warrant of 3585 Darling Hill Road (where defendant resided with his ex-girlfriend, Tracey Baker, and children) dated April 9, 2018 and executed on April 10, 2018 which lead to evidence of controlled substances; (6) interrogations of Defendant on April 10 and 12, 2018 during which he made incriminating admissions concerning the distribution of narcotics over the darkweb and gave agents signed consent to search his darkweb accounts and a mail parcel leading agents to incriminating evidence; and (7) a ninety parcel search warrant on April 17, 2018 which lead to the seizure of controlled substances.

## II.    Motion to Suppress Evidence of Extended Border Search

The March 29, 2018 extended border search of two international parcels addressed to Defendant violated his Fourth Amendment right to be free from unreasonable search and seizure because agents lacked reasonable and articulable suspicion to believe the parcels contained illegal narcotics.



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

A party moving to suppress evidence "bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991).   An "extended border search", which agents conducted on the subject parcels here, is a search conducted after property has cleared an initial customs checkpoint and has entered the United States. *United States v. Garviria*, 805 F.2d 1108, 1112 (2d. Cir. 1986)(*citing United States v. Glaziou*, 402 F.2d 8, 13 (2d. Cir. 1968). An extended border search does not require a warrant but, due to the greater intrusion on legitimate expectations of privacy, it is permitted only if supported by reasonable suspicion." *Garviria*, 805 F.2d at 1112.   Agents must have more than just a hunch of criminal activity to conduct an extended border search (*United States v. Sokolow*, 490 U.S. 1, 7 (1989)), suspicion must be based on articulable facts combined with meaningful inferences of a trained law enforcement officer. *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015).

The subject extended border search was executed at the East Burke Post Office by Inspector Dunham and Agent West on two identical small envelopes addressed to Sam Bent, P.O. Box 22, East Burke, VT 05832, USA, with return address KR Property C/Castano 79, 2 29651, Miajas Cost, Malaga, Espana. See Exhibit A for picture of the front and back of the subject parcel.  The agents stated grounds for reasonable suspicion to search were that "HSI … has received information that the user(s) of screenname '2Happytimes2' may be distributing narcotics illegally over the dark web [and] has learned that P.O. Box 22 in East Burke … is associated with this investigation".  These are not sufficient facts to support a reasonable belief that the parcels contained narcotics.  Agents did not have any evidence tying Defendant to the screenname "2Happytimes2" and there were four other individuals authorized to receive mail at P.O. Box 22.

Furthermore, none of the accepted drug smuggling / drug package profile factors to establish reasonable suspicion to search a parcel for are present here.  Factors sufficient to establish reasonable suspicion of a drug package profile generally included: "(1) package heavily wrapped in tape and attempt made to seal all openings; (2) hand printed or written labels; (3) unusual return name and address; (4) unusual odor coming from the package; (5) fictitious return address. *United States v. Martinez*, 869 F. Supp. 202, 209, FN2 (S.D.N.Y. 1994). Here, there is no evidence of Defendant purchasing Express or Priority Mail packages, nor that he frequently mailed / received parcels at P.O. Box 22 or other Post Offices; the parcels subject to the search were small envelopes and not heavy, had printed labels / were not handwritten, and

KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

3

were not marked fragile; the parcels were not sent by Express Mail, were not heavily taped or sealed, and not alleged to have an unusual odor; the parcels were sent from Spain which is not a known source drug country, and were sent to Vermont which is not known drug state; and the parcels were sent to a real person, Defendant, and to a P.O. Box that Defendant is authorized to receive mail at; and there is no evidence that the return address and sender are fictious. Moreover, Inspector Dunham, who lead the extended border search, has little experience as a narcotics investigator and had only been working for the U.S. Postal Inspection Service for one year at the time of the subject search and there is no evidence of him having any prior professional experience in narcotics trafficking. *United States v. Evans*, 282 F. 3d 451, 455 (7th Cir. 2002)(reasonable suspicion to search parcel for illegal narcotics in light of the U.S. Postal Inspectors 11 years of experience and the following factors - Express Mail package, handwritten label, sent from drug source state, address on package had received parcels with fictious return address on previous occasions).

When viewing the above evidence / lack thereof in the context of suspected narcotics trafficking, and in light of U.S. Postal Inspector Dunham's minimal experience in drug trafficking, it was not reasonable for agents to suspect the subject parcels contained illegal narcotics. The agents warrantless extended border search therefore violated Defendant's Fourth Amendment right and all evidence seized as a direct and indirect result of the extended border search must therefore be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

## III.    Motion to Suppress Show Up Identification of Co-Defendant

The Due Process Clause of the Fourteenth Amendment requires the suppression of any pretrial identification procedure that is unduly suggestive and not otherwise independently reliable. *Manson v. Brathwaite*, 432 U.S. at 114. In determining the admissibility of a pretrial identification, the court must undertake a two-step analysis which begins with considering whether the identification procedure was unnecessarily suggestive. *Raheem v. Kelly,* 257 F.3d 122, 133 (2d Cir. 2001)(*quoting Neil v. Biggers*, 409 U.S. 188, 198 (1972)("Suggestive identification procedures 'increase the likelihood of misidentification,' and '[i]t is the likelihood of misidentification which violates a defendant's right to due process'"). If yes, the court must then "weigh the corrupting effect of the suggestiveness against other factors indicating that the identification may be independently reliable." *Id.* at 135.

The photo identification procedure employed to identify co-defendant consisted of two single photo show-up presented to two USPS employees. A showup – the presentation of a



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

single suspect or a single photo of the suspect to a witness – is the least reliable identification procedure an identification procedure (*Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir. 199) and is "widely condemned" as "inherently suggestive". *Brisco v. Ercole*, 565 F.3d 80, 88 (2d. Cir 2009), *cert. denied*, 558 U.S. 1063, (2009).  "Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary . . . to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect." *Id.*  Courts have "held that identification evidence from showups held in close temporal and geographic proximity to the crime scene" as not unnecessarily suggestive. *Id.* at 89 (*citing Bautista*, 23 F.3d at 731).

The first of the two showup identifications of co-defendant at issue here was made by witness Imre Bogar, a USPS clerk at the Orleans Post Office, on March 26, 2018.  The identification followed a March 23, 2018 report to agents by Orleans Post Office Postmaster Carmen Riendeau relaying that clerk Bogar's witnessed a woman ship eight parcels, allegedly using a fictious return addresses, on March 22, 2018. Agent West traveled to Orleans Post Office on March 26, 2018 and presented a single DMV photograph of co-defendant Djeneba Bent to clerk Bogar, Bogar's said "that he was 95% sure it was the same female who had mailed the parcels on March 22, 2018". <u>Exhibit B</u> for 5/14/2018 ROI Report. The second show up identification of co-defendant occurred on March 27, 2018, during which Agent West presented the same single photograph of co-defendant to East Burke USPS clerk Lisa Smith-Bean, Smith-Bean's reportedly said "Djeneba Bent received parcels at the P.O. Box in the past, but now she comes in about once a month to mail out parcels". *Id.*

There are sufficient facts to make a threshold showing that the photo showup identification procedure employed here was unnecessarily suggestive.  Agent West presented each of the USPS clerks with a single photograph of co-defendant, rather with a photo array to avoid the high risk of suggestion and unreliability associated with showup identifications. *See Dunnigan*, 137 F,3d at 129 (photographic showup of pictures of one person and no pictures of anyone else was "highly suggestive"). Second, no exigent circumstances existed to justify to the single photo showups given that no arrests had been made in the investigation to raise the concerns  of having arrested any innocent persons (*United States v. Maldonado*, 20 Fed. Appx. 59, 61 (2d Cir. 2001)(show-up identification "not unnecessarily suggestive," as "[s]peed was essential. If the police had arrested the wrong individual they needed to release those improperly arrested and continue their search")); and there are no facts to indicate agents believed either of



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA • SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

the USPS clerks, or the co-defendant, were at risk of dying or otherwise becoming unavailable. *Stovall v. Denno*, 388 U.S. 302 (1967)(suggestive showup identification did not violate due process because sole eyewitness to crime was at risk of dying and was unable to travel from hospital to police station for lineup). Furthermore, the showups did not take place in close temporal proximity of the alleged crime. Instead, the first identification took place four days later and, as for the second, USPS clerk Smith-Bean failed to state and/or did not recall when she last saw co-defendant which suggests an even longer temporal proximity. *Bautista*, 23 F.3d at 729-30 (presentation of suspects to confidential informant immediately after raid was not unnecessarily suggestive); *United States v. Gonzalez*, 864 F. Supp 375, 386 (S.D.N.Y. 1994) (on-scene identification by off-duty police officer who had witnessed criminal conduct twenty minutes earlier was not unduly suggestive).

The absence of any facts showing agents need to quickly identify co-defendant via a highly suggestive single photo showup is made evident by the three day gap between clerk Postmaster Riendeau's March 23, 2018 report to agents regarding the eight parcels with fictious return addresses and Agent West thereafter traveling to Orleans Post Office on March 26, 2018 to obtain the identification.  The showup identifications were therefore not "not justified by any exigent circumstances" and, as such, were unnecessarily suggestive.  *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 403-04 (7th Cir. 1975).

It is now necessary to determine "whether under the totality of the circumstances, the identification[s] w[ere] reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199.  The following five factors established in *Neil v. Biggers* are considered in determining whether an identification is independently reliable: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Dunnigan v. Keane*, 137 F.3d 1117, 128 (2d Cir. 1998)(*quoting Neil v. Biggers*,  409 U.S. 188, 199-200 (1972)).

The showup identifications herein do not possess sufficient indicia of reliability to overcome their suggestiveness, first, because clerk Bogar's opportunity to view co-defendant on March 22, 2018 was likely limited as he only claims to have observed her mail parcels on one occasion.  Similarly, clerk Smith-Bean's ability to view co-defendant was likely limited as she



KAPLAN KAPLAN
ATTORNEYS AT LAW
PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

claims only to have observed co-defendant mail / pick up parcels from a P.O. Box. In addition, there is no evidence of any exchanges between co-defendant and either clerk.

Second, the facts suggest that clerks Bogar and Smith-Bean's degree of attention on the individual they identified as co-defendant was minimal. Clerk Smith-Bean did not allege observing the individual she identified as co-defendant display any suspicious behavior to draw her attention on the individual. Similarly, clerk Bogar's only claims to have observed co-defendant mailing parcels on one occasion and it was not until after the co-defendant allegedly dropped the parcels off for mailing that clerk Bogar allegedly discovered the return addresses to be fictious. Clerk Bogar's degree of attention on this individual would have presumably been heightened had he discovered the fictious addresses while she was still present, but that is not the case here. There is also no evidence of clerks Bogar or Smith-Bean having been trained in identifying persons. *Dickerson v. Fogg*, 526 F. Supp. 1299, 1306 (S.D.N.Y. 1981)(witness' degree of attention does not support the reliability of his identification in part because evidence that the witness, a trained security supervisor, had any training for identifying people). For these reasons, the clerks' degree of attention do not support the reliability of their identifications.

Third, there is no evidence of the USPS clerks providing a prior description of co-defendant before their showup identifications. This factor does not sustain the reliability. The fourth - the level of certainty in their identification - is neutral as far as clerk Smith-Bean's identification as there is no evidence of her level of certainty. Regarding clerk Bogar, he did not provide absolute certainty in his identification of co-defendant and reportedly advised agents he was "95% certain".

The fifth and final factor - the length of time between the alleged crime and identifications - also does not support reliability. Clerk Bogar's identification occurred four days after he allegedly observed co-defendant. Clerk Smith-Bean reportedly told agents co-defendant comes to the Post Office once a month and did not and/or was unable to provide the date she last saw co-defendant suggesting a larger lapse of time. This factor therefore points towards misidentification as the length of time between both identifications falls outside the initial period immediately following the alleged crime when a witness' memory is most likely reliable. *See Dickerson*, 692 F.2d at 247 (forty hour length of time between crime and confrontation did not support reliability of identification); *Boles v. Senkowski*, 878 F. Supp. 415, 423 (N.D.N.Y. 1995)(identification took place between approximately twenty and thirty minutes after the crime weighed in favor of reliability).



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

7

Based on the totality of the circumstances, it cannot be concluded that the single photo up identifications of co-defendant were reliable independent of their highly suggestive means. The identifications ran afoul of the Fourteenth Amendment Due Process Clause not only based on the above *Biggers* factors, but also because the unnecessarily suggestive showup identification procedure employed increased the likelihood that misidentification would lead to irreparable harm including the widespread distribution of her photograph to Postal Offices in Northern Vermont on March 28, 2018 and seizure of six parcels at Danville, Vermont Post Office on March 29, 2018 after a USPS clerk identified co-defendant as the mailer from the photo distributed; and April 3, 2018 search warrant application and search of the same six parcels, during which agents recovered evidence of controlled substances. For these reasons, the showup identification and evidence derived therefrom, including from the April 3, 2018 search and seizure of the six parcels, must be suppressed.

## IV.    *Franks* Hearing & Motion Suppress Six Parcel Search Warrant

Defendant requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) to challenge a search warrant application submitted by Inspector Dunham (or "the affiant") on April 3, 2018 to search six parcels which were allegedly mailed by co-defendant at the Danville Post Office on March 29, 2018 and suspected to contain narcotics. Defendant seeks suppression of all evidence seized pursuant to the six parcel search warrant, as well as all evidence derived therefrom, on grounds that the affiant acted with reckless disregard for the truth and made deliberate falsehoods and material omissions which were material to the magistrate's probable cause determination.

"A *Franks* hearing allows a defendant to challenge the integrity of a warrant affidavit in an effort to demonstrate that the warrant was not issued on the basis of probable cause." *United States v. Murray*, 2017 WL 1052579, *51 (D. Vt. 2017)(*citing Franks*, 438 U.S. at 171-72). "[W]here a defendant makes a preliminary showing that the [search warrant] affidavit misstated or omitted material information, *Franks* instructs a district court to hold a hearing to determine whether the alleged misstatements or omissions in the warrant … were made intentionally or with reckless disregard for the truth and, if so, whether any such misstatements or omissions were material." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)(internal quotations omitted); *See also United States v. Martin*, 426 F.3d 68, 73–74 (2d Cir. 2005).



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

If the defendant proves by a preponderance of evidence that the false statements, misrepresentation and/or omissions within the search warrant application were the result of the affiant's deliberate falsehoods or reckless disregard for the truth, the Court must "delete false or misleading statements and insert the omitted truths" and then determine whether what remains of the affidavit is sufficient to establish probable cause. *United States v. Ippolito*, 774 F.2d 1482, 1486 n. 1 (9th Cir. 1985); *See also United States v. Canfield*, 212 F.3d 713, 718 (2d Cir.2000)("The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause"). If the affidavit does not establish probable cause without the erroneous information and/or with the omitted material, the court must void the search warrant and suppress the evidence seized pursuant to said search warrant. *Rajaratnam*, 719 F.3d at 146 (*citing United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980)).

The subject search warrant application (or "application" or "affidavit") cited 21 U.S.C. §§ 841a(a)(1) and 845 as the related charge - "[p]ossessing with intent to distribute … and conspiring to possess with intern to distribute … controlled substances." The application sought authorization to search six mail parcels sent via USPS Priority Mail.   As grounds for probable cause to search, the affidavit cited the following information:

- East Burke P.O. Box 22 is registered to Tracy Baker at 3585 Darling Hill Road, East Burke, VT and also lists Sammy Bent, Isabella Sepulveda-Muniz, Chelsea Baker, and Sammy Bent Jr. as authorized to accept mail;
- P.O. Box 22 ordered a large quantity of Priority Mail shipping boxes and received multiple domestic and international parcels according to USPS employees;
- Co-defendant was observed operating a vehicle bearing the same license plate by a USPS clerk in Littleton, NH as observed by agents at 3585 Darling Hill Road;
- Agent West presented co-defendant's DMV photo to Orleans USPS clerk Bogar who stated he was "95% sure it was the same female who mailed parcels on March 22, 2019" and to East Burke USPS clerk Smith-Bean who stated she had seen co-defendant mail/receive parcels;
- Agent West disseminated co-defendant DMV photo to several Post Masters in Northern Vermont and, in response, was alerted that she mailed parcels from Post Offices in Littleton, New Hampshire and in Danville, West Burke, Lower Waterford, Lyndonville and St. Johnsbury, Vermont; and
- On March 29, 2018, co-defendant shipped six parcels (the parcels subject to the April 3, 2018 search warrant) from the Danville Post Office using the return address



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

9

William Currier, 462 Railroad Street, Saint Johnsbury, VT 05819. [1] See <u>Exhibit C</u> for
April 3, 2018 Search Warrant Application.

The affidavit also cites, as grounds for probable cause, the following statements which
are the subject of the instant request for a *Franks* Hearing:

- HSI New York agents made an undercover *purchase over the dark web, "of
  approximately $70 worth of Lysergic Acid Diethylamide (LSD)* … [and, o]n March
  13, 2018, in response … HSI in NY seized a mail parcel containing suspected LSD
  blotter paper tabs. The return address on the label was William Currier, 462 Railroad
  Street, Saint Johnsbury, VT 05819" (emphasis added).

- On March 27, 2018, agents observed a black receptible at the end of the driveway at
  3585 Darling Hill Road and later seized said trash from the collection bay of a trash
  vehicle and the following contents were seized from the trash: three rubber gloves,
  three opened shipping envelopes from Spain (one of which was addressed to Sam
  Bent at P.O. Box 22), and *"[a] clear plastic baggie containing an unknown white
  residue … [and that] the baggie and residue were transported to the Vermont
  Forensic Laboratory for testing"* (emphasis added).

- On March 29, 2018, Inspector Dunham and Agent West conducted an extended
  border search of two international parcels from Spain addressed to Sam Bent at P.O.
  Box 22, both parcels included two vacuum sealed bags continuing a dark thick
  substance. *"[T]he VSP ran multiple fields tests on the substance … [and t]he
  substance tested positive for heroin"* (emphasis added).

The affiant omitted material information from the affidavit regarding the alleged "clear
plastic baggie containing an unknown white residue" found in trash seized from 3585 Darling
Hill Road. On April 2, 2018, Agent West was notified by the Vermont Forensic Laboratory that
the white residue contained <u>no</u> regulated substances. See <u>Exhibit D</u>, ROI No. NT13LR18NT001-
006, p. 3; *United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995)(a deliberate or reckless
misstatement or omission by a governmental official who is not the affiant may nevertheless
form the basis of a *Franks* claim); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.
1992)(same). Omitting the laboratory results which agents were made aware of prior to
submitting the search warrant application, from the affidavit was the result of the affiant's
deliberate design to mislead the magistrate into believing the white substance was an illegal
substance or reckless disregard for the truth because knew or should have known the negative lab
results would have material to the magistrate's probable cause determination. *Rajaratnam*, 719
F.3d at 154 ("*Franks* protects against omissions that are designed to mislead, or that are made in
reckless disregard of whether they would mislead, the magistrate"); *See also Wilson v. Russo*,


KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

---

[1] The six parcels alleged shipped by co-defendant Djeneba Bent on March 29, 2018 were the subject of the April 3,
2018 search warrant.

212 F.3d 781, 788 (3d Cir.2000) ("Omissions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known ... was the kind of thing the judge would wish to know")(internal citations omitted).

As for the affiant's statements of the March 13, 2018 seizure of a mail parcel containing suspected MDMA purchased undercover on the darkweb, the affidavit omitted that the NY HSI agents (who were/are not involved in the instant investigation) "were unable to field test the blotter paper tabs for LSD" upon seizure, had not field or lab tested the paper tabs as of January 9, 2019, and had never before purchased LSD (or any narcotics) from the specific dark web user. Without having lab tested or at least field tested the paper tabs for LSD and given that the HSI NY agents purchased the suspected LSD over the dark web from an anonymous dark web user for the first time (rather than in person from a known narcotics dealer), there was/is no credible evidentiary basis for agents to suspect the paper tabs contained LSD. The affiant deliberately mislead the magistrate or acted with reckless disregard for the truth in omitting these facts as he knew or should have known that said would have been material to the probable cause determination.

Finally, the affiant should not have included any statements regarding the March 29, 2018 extended border search of the two international parcels because he knew or should have known that all evidence obtained therefrom, including the field tests, were seized in violation of the Defendant's Fourth Amendment and thus constitute fruit of the poisonous tree. However, in the event the Court holds otherwise, Defendant is entitled to a *Franks* hearing on this evidence because the affiant made falsely stated that the substances seized in the extended border search field tested positive for heroin and made material omissions regarding said field tests.

The affiant materially omitted that the field tests agents utilized to test the substance for heroin on March 29, 2018 - the SIRCHIE NARK II 33 Fentanyl Reagent and SIRCHIE NARK II 10 Special Opiates Reagent - would produce unreliable results and false positive results. Sirchie, the manufacturer of these field tests, explicitly instructs users "if your probable cause indicates heroin, *always start with the Meckes Reagent*". [2]  See <u>Exhibit E(1)</u>, *Heroin: An Increasing National Threat*, Sirchie NARK NEWS, Volume 9, p. 15-17 (June 2015)(emphasis added). The Fentanyl and Special Opiates Reagents tests used by agents are designed to test for "*fully-synthetic opiates*", which is why Sirchie instructs users *not* to use the Special Opiates Reagent



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

---

[2] Note, agents used the Meckes Reagent to test for heroin in a substance contained in one of the six parcels seized pursuant to the search warrant being challenged.

and Fentanyl Reagent field tests to test for heroin because *heroin is a semi-synthetic opiate*. See Exhibit E(2), *Heroin ... Fentanyl -What do we have?*, Sirchie NARK NEWS, Volume 6, p. 2-3 (August 2013)(emphasis added). Sirchie specifically advises that the Special Opiates Reagent "is designed specifically for fully synthetic opiates [including] oxycodone, oxycontin, fentanyl and buprenorphine (Suboxone)", and that "[d]ue to the number of false positives this allows for heroin, *we strongly recommend avoiding its use for semi-synthetic opiate (Heroin)* and limit the testing to only full synthetic substances." *Id.* at 3 (emphasis added). Similarly, Sirchie advises that the Fentanyl Reagent "is designed to identify either Fentanyl or Acetyl- Fentanyl which is commonly cut into heroin" (See Exhibit E(3), *Narcotics Investigation*, Sirchie Forensics, 17 (2017)), and instructs users to "start[] testing with the specific Heroin field test of Meckes Reagent Modified". Exhibit E(2), 1-2. The affiant therefore omitted that agents did not utilize the proper field test to test the substance for heroin.

Second, though any field results obtained are inherently unreliable given agents failure to use the proper field test to test for heroin, the subject field tests do not show a positive color reaction for heroin. For the Special Opiates Reagent field test, a positive color reaction for heroin, Morphine and Buprenorphine will present as a "red-violet color", Codeine as blue, and Oxycodone as yellow.[3] See Exhibit E(4), Sirchie, *NARK II Narcotics Analysis Reagent Kit*, Operators Manual, 13-14. The Special Opiates Reagent test performed by agents here produced a color appearing almost black, not red-violet. See Exhibit F for photo of completed Special Opiates Reagent test (Bates #1524, 1527-28). For the Fentanyl Reagent, a positive color reaction for heroin presents purple and yellow for fentanyl. See Exhibit E(5) for Sirchie Fentanyl Reagent product description with photographs showing positive color reactions. The two Fentanyl Reagent tests performed by agents here did not produce a purple color to indicate a positive reaction for heroin. Rather, one test produced a very dark purple-almost black color and the other produced a light pinkish brown color. See Exhibit G for photos of the completed Fentanyl Reagents tests (Bates #1525). The color reactions obtained from Fentanyl Reagents and Special Opiates Reagent tests, thus, could not have reasonably been interpreted as a positive identification for heroin. Notably, the seized substances were sent to Vermont Forensic Laboratory for analysis and did <u>not</u> test positive for heroin.



PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

---

[3] The Special Opiates Reagent is not capable of giving a presumptive identification of heroin given that red-violet color reaction is also positive reaction for Morphine and Buprenorphine.

Based on the above facts, the affiant knew or should have known, based on experience and training, that (1) the substance was not properly tested for heroin and the results obtained from the subject field tests are inherently unreliable; (2) that agents should have utilized a field test designed to test for heroin (e.g. Meckes Reagent Modified) to test the substance, and (3) that the seized substance did not field test positive for heroin.  The affiant's false statements and omissions regarding the positive heroin field tests were thus deliberate or resulted from a reckless disregard for the truth and were material to the magistrate's probable cause determination given the alleged criminal conduct - narcotics trafficking - underlying the search warrant application.[4]

After setting aside the false information (the positive heroin field tests) and inserting the omitted information (that the white residue lab tested negative for controlled substances and the lack of credible evidence to suspect the paper tabs seized on March 13, 2018 contained LSD), the only remaining evidence in the search warrant affidavit includes co-defendant's alleged use of the same return address (462 Railroad Street, Saint Johnsbury, VT 05819) on the six parcels subject to the instant search warrant application as on the envelope seized by HSI NY on March 13, 2018 and that co-defendant sent/received several mail parcels in Northern Vermont. This is not sufficient to evidence of a drug package profile (aka "drug smuggling profile") to establish the lower bar of reasonable suspicion to search a mail parcel, let alone probable cause.[5]   The

---

[4] In the 4/9/2018 4385 Darling Hill Road and 4/17/2018 ninety parcel search warrant applications, the affiant made the same false statements omission regarding the March 29, 2018 heroin field test results and the March 13, 2018 seizure of paper blotter tabs suspected to contain LSD. The applications also contain false statements regarding lab results of substances found in the six parcels seized pursuant to the April 3, 2018 search warrant application – the affiant falsely stated that five of the six parcels tested positive for controlled substances when only four of the six parcels (#1-4) were tested and tested positive for controlled substances. Exhibit H, ¶6(a) for 4/9/2018 Search Warrant Application (Bates #000000254-255); and Exhibit I, ¶ 11(Bates #000000151-152) for 4/17/2018 Search Application and ¶13 of Exhibit 1 attached thereto (Bates #000000162). In addition, in the 4385 Darling Hill Road search warrant application that the white residue found in the trash seized on March 27, 2018 lab tested negative for controlled, yet omitted said lab results from his discussion of the white residue and other contents of the seized trash in the ninety parcel search warrant application.

[5] See e.g. United States v. Colon, 386 Fed. Appx. 229 (3d Cir. 2010)(Express Mail package, sent from drug source location, mailed from a post office outside of the zip code on the return address, no one by the sender's name lived at the return address, and heavily taped); United States v. Gomez, 312 F.3d 920, 922 (8th Cir. 2002)(Express Mail was sent from drug-source city and state, heavily taped to thwart drug dog, stamped "FRAGILE", package was unusually large and weighed 12 pounds, paid for in cash, mailed on Friday for delivery on Saturday, and sender and addressee had same last name); United States v. Hernandez, 313 F.3d 1206 (9th Cir. 2002)(Express Mail package, handwritten label, sent from drug source state, name on return address could not be confirmed, and almost all seams on package were sealed). See also United States v. Johnson, 171 F.3d 601, 603 (8th Cir. 1999)(inadequate evidence of drug smuggling profile to establish reasonable suspicion the package contained narcotics "the labels were handwritten, the package was mailed from one individual to another individual at the same address, the package was mailed from a narcotics source state, and the return address zip code was different from the accepting zip code").

KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

13

elements of a drug smuggling profile are not present based on the following information alleged (and not alleged) in the affidavit: (1) the six parcels were sent Priority Mail, rather than Express Mail to guarantee next day delivery; (2) the parcels were small and not unusually large or heavy; (3) the parcels were not alleged to have been paid for in cash, were not marked fragile and had printed labels rather than handwritten; (4) the parcels were not heavily taped or sealed; (5) the parcels were being sent from a Post Office in Danville, Vermont, which is not a high crime area and not in a known drug source state; (6) the parcels were sent from a post office just eleven miles away from the return address; (7) the return address was not fictitious and there is no evidence that the return addressee name or recipient names were fictitious; and (8) the affiant's minimal experience (one year) in narcotics trafficking. *Evans*, 282 F. 3d at 455.

There is not adequate lawful information remaining in the affidavit to support probable cause to search the six parcels after the false statements are removed and omitted information is included in the affidavit. The good faith exception does not apply here as the affiant had no reasonable basis for believing the warrant was valid. The six-parcel search warrant must therefore be voided and all evidence obtained pursuant to and as an indirect result of said search warrant must be suppressed. *Rajaratnam*, 719 F.3d at 146; *Wong Sun*, 371 U.S. at 484-85. In addition, all evidence obtained as an indirect result of the six parcel search must be suppressed including, but is not limited to, evidence obtained pursuant to the April 9th search warrant for 4385 Darling Hill Road, April 17th ninety parcel search warrant, and Defendant's inculpatory statements.[6]

## V. Motion to Suppress Defendant's Involuntary Confessions & Consent to Search

Defendant's confessions and waiver of his right to refuse consent to search during interrogations on April 10 and 12, 2018 were involuntarily and must be suppressed pursuant to his Fifth Amendment right against compelled self-incrimination.

### a) Defendant's Inculpatory Statements

Defendant's first interview with law enforcement took place on April 10, 2018 at his residence, 3585 Darling Hill Road, during the execution of the search warrant of his house. Law

---

[6] As grounds for probable cause to search, the 4/9/2018 4385 Darling Hill Road and 4/17/2018 ninety parcel search warrant applications included (1) evidence of controlled substances found in the parcels during the April 3, 2018 six parcel search and (2) an attachment of the April 3, 2018 six parcel search affidavit labeled "Exhibit 1". See <u>Exhibit H</u> and <u>Exhibit I</u>. Additional grounds included in the ninety parcel search warrant application were (1) additional USPS clerks showup identifications of co-defendant using the single DMV photo agents distributed to Northern Vermont Post Offices following/as a result of the prior unconstitutional showup identifications on March 27 and 28, 2018; and (2) evidence of controlled substances seized pursuant to the 4385 Darling Hill Road search warrant and admissions Defendant made during and immediately following said search.


KAPLAN and KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

enforcement arrived at Defendant's house shortly after 10AM on April 10th, knocked on his front door and Defendant answered. Defendant was immediately directed by an armed officer to remain seated in the front porch while several uniformed and plain clothes law enforcement officers entered his house with their weapons drawn. For the next hour-and-a-half, Defendant remained in the front porch with an armed officer watching him. It was approximately 34 degrees and officers were continuously exiting and entering the house for the next hour-and-a-half.  Defendant was not advised his *Miranda* right, that he was not under arrest or that he was free to leave throughout that hour-and-a-half.

At 11:29AM, while the search was ongoing and Defendant still sitting in the cold porch, Agents Adam Poser and Jamie West began to question Defendant without first *Mirandizing* him. Approximately one minute into the interview, Agent Poser and Defendant had the following exchange:

> Agent Posner: You're not under arrest today, my goal is not too arrest you …[;] if you want to help yourself and your family, I'm curious of what your access is [referring to his vendor status on the darkweb and distribution of narcotics on the darkweb]… My goal is to the further a criminal investigation …, your goal is to get your bang for your buck so you get the most credit for things …
>
> Defendant:  Shouldn't we write this down in an agreement?
>
> Agent Poser: We certainly can down the road …
>
> Defendant: Would people know? [referring to it getting out that he was cooperating. Agents did not respond to this question].

Agents Poser thereafter interrogated Defendant about his "mod status" and accounts on darkweb marketplaces, who supplied him narcotics and use of bitcoin currency in sales over the darkweb.  Defendant made incriminating statements in response to these questions.

Later in the interview, Agent West began questioning Defendant about any controlled substances currently in his possession, recent sales, and mailing / receiving packages containing narcotics via USPS mail. Defendant made incriminating statements in response to these questions.   Agent West also specifically asked Defendant, "When was last time you sold heroin?"; Defendant responded, "I've never sold heroin".  Agent West later told Defendant, "one of the packages that came in … a week ago, we tested it and it tested positive for heroin".  The alleged heroin the Agent is referring to the substance seized pursuant to the March 29, 2018 extended border search that lab tested negative for heroin. The interview ended after a little more than an hour-an-half of questioning.



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

Defendant was next contacted by Agent West on April 12, 2018 by telephone at approximately 12:30PM.  Agent West told him that he and another agent were coming to pick him up at 1PM and to be waiting outside. Agents picked him up in or around 3PM and drove him to the Vermont State Police Barracks in St. Johnsbury. The Agents did not *Mirandize* him, tell him he was not under arrest or that he did not have to go with them prior to picking him up, upon picking him up or while driving him to the barracks.

The agents arrived with Defendant at the barracks in or around 4:00PM and took him into a conference room. There were three agents (Agent Poser, Agent West and Agent Charles Tinori) in the conference room who proceeded to interrogate him about his distribution of narcotics on the darkweb marketplaces and incoming packages from suppliers without first advising him of his right to remain silent and to an attorney, that he was not under arrest and that he was free to leave. Defendant was questioned for an hour and twenty minutes (gave agents inculpatory information from) before an agent told Defendant he was free to leave.

In addition, approximately two hours into the second interview, agents asked for Defendant for consent to access his darkweb marketplace accounts. This exchange went as follows:

Agent: Will you consent to us looking through those accounts?

Defendant: Why would you need my consent?

Agent: Because we don't, because we don't … We respect your constitutional rights.

Defendant: What rights would I be waiving if consented?

Agents did not respond to Defendant's question about what rights he would be waiving by consenting and, instead, presented him with a consent to search form to search all of his darkweb accounts.  The agents did not read the consent form aloud to Defendant, explain the wording of the consent form or explain the rights he would be waiving by signing the consent form.  Agents merely instructed him to read the consent form before signing.

After Defendant signed the above consent form, an agent asked him to sign a second consent form to a search package believed to contain MDMA which was delivered to Defendant at P.O Box 22 on April 10, 2018.  Defendant asked agents whether an additional charge would arise if he gave them consent to search the agents; agents told him "No … You don't get one count of possession of MDMA … It would be a conspiracy charge".   Defendant then signed the consent to search the package. A discussion as to Defendant's continued cooperation following, during which agents told him:



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

We want to turn this into something fruitful … If we screwed people over for a living, we wouldn't be having this conversation … We're not screwing with you, we're going to tell the prosecutor … You knew yesterday you were getting a charge, we pulled a lot of drugs out of your house … I can tell you something that could really hurt you is you if are all on board like you are and you realize that there might be a charge someday, there probably is going to be charge, and you do it half you help us half, you leave us in the dark on the other half … then all that stuff you did you get no credit.

The second interrogation concluded after approximately two hours and forty minutes.

**b)  Defendant's Confessions Were Involuntary**

The inculpatory statements Defendant made to agents during interrogations on April 10, and 12, 2018 were involuntary and are inadmissible at trial pursuant to Defendant's Fifth Amendment right against compelled self-incrimination.

Under the Fifth Amendment, a defendant's involuntary confession is not admissible at trial. *Dickerson v. United States*, 530 U.S. 428, 433, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); *See also DeWeaver v. Runnels*, 556 F.3d 995, 1002-03 (9th Cir. 2009) ("A confession must be suppressed, even absent a Miranda violation, when the totality of the circumstances demonstrates that the confession was involuntary"). "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). "[T]he government the burden to prove that a defendant's confession was voluntary." *Id.*

A confession is considered involuntary when "the defendant's will was overborne" by police coercion. *Yarorough v. Alvardao*, 541 U.S. 652, 667-68 (2004).  To determine whether a confession was obtained by coercion, the totality of the surrounding circumstances including: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *United States v. Allen*, 2013 U.S. Dist. LEXIS 82564, *18 (D. Vt 2013)(*quoting Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988)).  Facts bearing on the second circumstance "include the place where an interrogation is held, and the length of detention". *Scully*, 850 F.2d at 902.  Facts bearing on the third circumstance include, but are not limited to, repeated and prolonged questioning, failure to inform the accused of his constitutional rights; physical deprivations such as depriving an accused of clothing for a prolonged period; and promises of leniency or other benefits. *Id.*



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA - SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

The second factor of the totality of the circumstances test - the conditions of the interrogation - weighs in favor of Defendant's susceptibility to coercion.  The first interview of Defendant took place in the front porch of house with two agents questioning him, after an agent had already approached Defendant earlier with questions which Defendant declined to answer.  It was only 34 degrees outside and Defendant had already been sitting in the cold porch for approximately an hour-and-a-half under the watch of an armed officer before the interrogation began.  The agents interrogated him for more than an hour-and-a-half while several other armed officers were searched his house and were going in and out of the front door of his house.  With the exception of a thin leather coat an agent gave him after around an hour had passed, Defendant was wearing just a t-shirt, pants and socks throughout the more than three hours he was detained on April 10th.  As for Defendant's second interrogation on April 12th, it took place in a closed conference room at the Vermont State Police barracks with three armed agents present who questioned him for more than two-and-a-half hours. Moreover, agents also interrogated Defendant while transporting him to the barracks for the second interview.[7]

The third factor of the totality of the circumstances test - law enforcement conduct - weighs heavily in favor of Defendant's susceptibility to coercion.  Throughout the more than four hours of interrogation that Defendant was subjected to between April 10th and April 12th, multiple agents repeatedly questioned Defendant for incriminating information concerning his distribution of narcotics over the darkweb, his darkweb accounts and receiving/mailing narcotics via USPS mail.

On several occasions, agents made Defendant promises of leniency to induce Defendant into providing incriminating information. For example, at the start of the first interrogation, agent's told Defendant he would need to provide information about his darkweb accounts and distribution of narcotics on the darkweb if he "want[ed] to help [him]self and [his] family". *Lyman v. Illinois*, 372 U.S. 528, 534 (1963)(Threats or promises involving an accused's family members can render a resulting confession involuntary).  When Defendant asked for a written agreement setting forth the credit he would receive in exchange for cooperating (also at the start of the first interrogation), the agent responded "[w]e certainly can down the road". Agents never presented Defendant with a cooperation agreement thereafter.  During the second interrogation, an agent told Defendant he would "tell the prosecutor" if he continued to cooperate, and a separate agent followed by stating it would "hurt" him if he stopped cooperating. The agents'

---

[7] Agents' did not record the questioning that took place while transporting Defendant to the barracks.



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

threats, coupled with the attraction of their promises and the conditions of both interrogations, were sufficient to overcome Defendant's will. *United States v. Shears*, 762 F.2d 397, 402 (4th Cir. 1985)("there are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception of what the government agents have promised is an important factor in determining voluntariness").

Defendant also signed two consent to search forms during the second interrogation, the second of which authorized agents to search a mail parcel believed to contain MDMA that had been delivered to Defendant at P.O. Box 22 (and from Poland) the day prior. Defendant signed the consent to search the package directly after an agent made the following false inducements to him (1) there would be no additional charge against him if MDMA is found in the parcel subject to the consent to search; (2) he would not be charged with any single counts of possession of MDMA; and (3) the would only be charged with conspiracy. The agent's misrepresentations were based off unfulfillable promises that were not only designed to coerce Defendant into consenting to the search and incriminating himself, but also material to Defendant's decision to give agents consent to search the parcel. *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995), *cert. denied*, 516 U.S. 2282 (1996)(*citing Brady v. United States*, 397 U.S. 742, 755 (1970)("Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will"); *See also Shears*, 762 F.2d at 402. That Defendant was charged with two counts of possession of MDMA with intent to distribute in the underlying <u>Indictment</u> (Counts 3 and 5) demonstrates the falseness of the agent's representations and promises.

Agents also falsely represented evidence against Defendant during the first interrogation in telling him they seized a package mailed to him (in the extended border search) containing a substance that tested positive for heroin. *United States v. Lopez*, 437 F.3d 1059, 1066 (10th Cir. 2006)(determining that the agents' misrepresentation of the evidence against the defendant, combined with their promise of a lenient sentence, rendered the confession involuntary). As stated above herein, agents did not properly field test the substance for heroin and did not obtain a positive identification for heroin from the field tests or laboratory tests. *Supra*, 12-13.

Finally, Defendant was alone and without counsel during the interrogations and never advised of his right against compelled self-incrimination, right to remain silent and right to an attorney. *Ruggles*, 70 F.3d at 265 (promises of leniency did not render defendant's confession involuntary because defendant had been advised of his *Miranda* rights before the officer made



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013

said promises).  Agents also did not explain to him his right to refuse consent to search his darkweb accounts in connection with the form consent to search form he signed on April 12, 2018 and consent to search the mail parcel suspected to contain MDMA, despite Defendant's expressed confusion and questions as to what rights he would be waiving by signing the consent to search form.

The totality of the circumstances of the April 10th and April 12th interrogations including that Defendant was without counsel and not advised of his rights, together with the conditions of the interrogations and agents' misrepresentations and promises of leniency, demonstrate that Defendant's incriminating statements and consents to search were involuntary. Defendant's confession, consents to search and all evidence derived therefrom must be therefore suppressed pursuant to the Fifth Amendment.

## VI.    Conclusion

WHEREFORE, Defendant respectfully requests this Court grant his Motions to Suppress and Request for *Franks* Hearing and issue an order suppressing evidence obtained as a direct and indirect result of the (1) March 26 and 27, 2018 (and subsequent thereto) showup identifications of co-defendant; (2) March 29, 2018 extended border search; (3) April 3, 2018 six parcel search warrant, (4) April 9, 2018 search warrant of 3585 Darling Hill Road; (5) Defendant's April 10 and 12, 2018 admissions and consents to search; and (6) April 17, 2018 ninety parcel search warrant.

DATED at Burlington, Vermont this 4 day of February, 2019.

Respectfully Submitted By,

SAM BENT
By Counsel

KAPLAN AND KAPLAN

By: */s/ Stephanie M. Greenlees*
Stephanie M. Greenlees, Esq.
95 St. Paul Street, Suite 405
Burlington, Vermont 05401
(802) 651-0013
(802) 448-3478 (f)
sgreenlees@kaplanlawvt.com



KAPLAN AND KAPLAN
ATTORNEYS AT LAW

PARK PLAZA · SUITE 405
95 ST. PAUL STREET
BURLINGTON, VT 05402
(802) 651-0013