UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA,        )
                                 )
         v.                      )        Docket No. 5:18-cr-61
                                 )
SAM BENT and DJENEBA BENT,       )
         Defendants.             )

## OPPOSITION TO MOTION TO SUPPRESS AND REQUEST FOR FRANKS HEARING

Defendant Sam Bent has moved to suppress evidence against him based on several different arguments.  He challenges:

- the March 29, 2018, warrantless search of two parcels mailed to the defendant from Spain pursuant to extended border search exception to the warrant requirement;

- that the manner by which law enforcement confirmed the participation of Djeneba Bent in the charged conspiracy;

- the affidavits in support of three search warrants; and

- the voluntariness of his confessions during an interview in his East Burke home.

1

As shown below the motion's various arguments[1] should be denied in its entirety.

There was reasonable suspicion supporting the March 29 extended border search,

the identification of Djeneba Bent was reliable and non-suggestive, the search

warrants applications did not contain materially inaccurate information (and

established probable cause even without the portions defendant challenges), and

Sam Bent's interviews were voluntary.

## I.    OVERVIEW OF THE INVESTIGATION

### a.  HSI Undercover Bitcoin Exchange Money Launderer

At some point before May 2017, Homeland Security Investigations ("HSI")

agents took over the operation of, and operated undercover, a dark-web-based

money exchanger, operating on various dark web markets, such as "Hansa,"

"Alphabay," and "Dream."   The sole purpose of these marketplaces, which used or

use the "Tor" network, was to facilitate an illicit economy for the sale of drugs and

other contraband.    The dark web is a portion of the internet that is only accessible

---

[1] Local Rule 7(a)(4) calls for a 15 page limit to non-dispositive motions and oppositions to such motions.  The motion to which this opposition responds was 20 pages long, and nearly single spaced, and raised not less than four separate arguments, all of which could be construed as a separate motion.  In lieu of filing separate oppositions of about 15 pages each, this single filing responds to each of Defendants' arguments in a manner that exceeds 15 pages.  Under these circumstances, the United States requests leave of court to submit this pleading, or an opportunity to file four separate responses should such request be denied.

using software designed to obfuscate and anonymize user traffic and identities.[2]

Accessing the dark web requires encryption, as well as the ability to locate the

desired hidden services.  To conduct business over the dark web also requires

developing a trustworthy reputation for actually supplying the goods advertised for

sale.

The HSI-run bitcoin exchange was part of this economy.  Drug transactions

over the dark web networks frequently involve the use of bitcoin,[3] or other

---

[2] "The dark web is a collection of encrypted networks providing strong privacy protections to its users." *United States v. McLamb*, 880 F.3d 685, 687 (4th Cir. 2018).  "The Onion Router ("Tor") is an encrypted online network, one of several networks that make up the dark web. Tor uses a series of relay computers to mask the identity of online users. As a result, Tor obscures how, when, and where users access the internet. With such powerful anonymity protections, some use Tor for drug dealing, child pornography, and other nefarious purposes." *Id.* at 688.

[3] The Second Circuit has described bitcoin as follows:

> Bitcoins allow vendors and customers to maintain their anonymity in the same way that cash does, by transferring Bitcoins between anonymous Bitcoin accounts, which do not contain any identifying information about the user of each account. The currency is "traceable" in that the transaction history of each individual Bitcoin is logged in what is called the blockchain. The blockchain prevents a person from spending the same Bitcoin twice, allowing Bitcoin to operate similarly to a traditional form of currency. Bitcoin is also a completely decentralized currency, operating free of nation states or central banks; anyone who downloads the Bitcoin software becomes part of the Bitcoin network. The blockchain is stored on that network, and the blockchain automatically "self-updates" when a Bitcoin transaction takes place.

*United States v. Ulbricht*, 858 F.3d 71, 83 (2d Cir. 2017).

"cryptocurrency" to pay for the drugs.   The (HSI undercover) money exchanger offered to mail United States currency to persons looking to liquidate bitcoin. However, unlike legitimate bitcoin exchangers, who follow the required "know your customer" regulations and who typically charge a commission of one to three percent, the HSI-undercover exchange operated on the dark web and charged approximately 10% commission.  There is no reason why a person would opt for the more costly dark web exchange of bitcoin for dollars if the bitcoin had been legitimately obtained.

HSI conducted four exchanges of bitcoin with Sam Bent.  First, on May 16, 2017, on the Hansa dark web marketplace HSI purchased a quantity of bitcoin from a user with screen name "Sexygurl24" and, in exchange for a quantity of bitcoin, mailed $200 in United States currency to Sam Bent at PO Box 22, East Burke, Vermont ("PO Box 22").  Second, on September 27, on the TradeRoute dark web market place, HSI (acting undercover) purchased a quantity of bitcoin from the user with screen name "sexygurl," and mailed $1,000 mailed to RoseMarie McCrae, at an address in Somerset, Massachusetts.  RoseMarie McCrae was later confirmed to be Sam Bent's mother.  She has denied any participation in or knowledge of any of the bitcoin transactions involved in this investigation.

Third, on October 8, 2017, undercover HSI agents purchased bitcoin again on the TradeRoute marketplace, this time in exchange for $10,000 in United States currency delivered to Rosemarie McCrae in Somerset, Massachusetts.  And fourth, on  January 15, 2018, again using the undercover bitcoin exchange, HSI purchased bitcoin in exchange for sending $3,000 in United States currency to Sam Bent, PO Box, 22, East Burke, VT.

Postal records confirmed that PO Box 22 in East Burke belonged to Tracy Baker, of 3585 Darling Hill Road in East Burke, Vermont.  HSI also learned from postal records that persons named Sammy Bent and Sammy Bent, Jr. were authorized to receive mail at PO Box 22.

Because, as explained above, the unlicensed exchange, over the dark web, of bitcoin for United States currency serves no legal purpose, and because the commission charged by the undercover HSI bitcoin exchange operation was much higher than what a lawful bitcoin exchange may charge, HSI reasonably suspected that the person from whom it was buying bitcoin was engaging in an effort to launder proceeds from other unlawful conduct.

**b.  HSI Undercover Purchase of LSD.**

On March 8, 2018, undercover HSI agents purchased a quantity of LSD from the dark web vendor who used the screen name "2happytimes2" on the dark

web "Dream Market."  They did so by placing an order for "10x 100mcg Fractal

Storm" on the "Dream Market" vendor page for "2happytimes2," part of which is

depicted below (with one redaction and two red-circles added):



As the red-circled features on the above image shows, the seller 2happytimes2 was

offering within the "LSD" category "High quality acid!"  The vendor further

prescribed how "1/2 hit" would be "enough for beginners or inexperienced users,"

"1-1.5 hits" would provide a "strong trip, suitable for most of the experienced

users," and "2-3 hits" would provide a "very strong trip." The page further contained an image of strips of the LSD blotter paper.

The web page also contained the following messages under its "terms and conditions":



As the above-image shows, as of March 2, 2018, the Dream Market user 2happytimes2 communicated to its customers that "Acid, and MDMA gel capsule listings are now live. Hash relisted, get it while it lasts. :)" As of March 4, however, ""Hash listings are down for a day or two," but the following date "Hash listing back up." As of March 7, however, "MDMA Gel Capsules listing down for the time being."

On March 13, 2018, undercover agents received through the mail a priority mail postal box, containing a priority mail envelope, which contained a silver colored, sealed package bearing a label for "organic dried fruit." Inside the

"organic dried fruit"-labeled package was a strip of blotter paper that looked like that featured on the 2happytimes2 Dream Market vendor page.  An image of that package and its contents is below:



Agents were unable to field-test the suspect LSD, but sent the material to the DEA lab for analysis.  Testing conducted in January 2019 confirmed the substance sold by 2happytimes2 was Lysergic Acid Diethylamide, commonly known as LSD.

The return address on the Priority Mail box containing the LSD was William Currier at 462 Railroad St., Saint Johnsbury, VT 05819.

HSI investigators believed the person with whom it had exchanged money for bitcoin using the address of Sam Bent at PO Box 22, East Burke and using

variations of the "sexygurl" username, was also the person using the 2happytimes2 username on other dark web markets.

This conclusion was in part due to visibility that law enforcement gained into the Hansa dark web market following that platform's takedown in mid-2017.[4] For example, law enforcement was are that the password used to access the "2happytimes2" page on Hansa, consisting of an apparently random series of letters and numbers, had also been tried unsuccessfully to access the "sexygurl24" page on that forum (the page corresponding to a bitcoin launderer who used PO Box 22). The random nature of the password was a very strong indication that the sexygurl24 was the same person as 2happytimes2 on Hansa. Agents also determined that 2happytimes2 on the Dream Market – the seller of LSD, with the St. Johnsbury return address – was the same person or persons behind 2happytimes2 on Hansa because both identities used the same public PGP key.[5]  In

---

[4] *See* Andy Greenberg, Wired Magazine (March 8, 2019), *Operation Bayonet: Inside the Sting That Hijacked an Entire Dark Web Drug Market*, Wired Magazine, available at https://www.wired.com/story/hansa-dutch-police-sting-operation/ (lasat visited March 4, 2019) (recounting how law enforcement had visibility into the Hansa dark web market for about a month before it was taken down in July 2017).

[5] Two accounts using the same public key indicates they are operated by the same person or are otherwise closely connected.A public PGP key, allows for encrypted communications, and consists of a long string of alphanumeric symbols. Importantly, each public PGP key corresponds to a unique a private key that is required to receive messages sent using the PGP protocol.

other words, 2happytimes2 on Hansa was closely connected to sexygurl24 on Hansa (a bitcoin launderer using PO Box 22). 2happytimes2 on Hansa was also closely connected to and 2happytimes2 on the Dream Market (the LSD seller using the 464 Railroad Street, St. Johnsbury return address).

Put simply, if a = b, and a = c, then b = c.

Other features supported the conclusion that 2happytimes2 on the Dream Market (the LSD seller), and sexygurl24 on the Hansa market (the bitcoin seller), were the same person. This conclusion was a reflection of the use of sexygurl24's password to try to access 2happytimes2's page on the Hansa market, the identical username (2happytimes2) on both the Hansa market and the Dream Market, the dark web presence of both markets, the illegal nature of the transactions conducted, as well as the geographic proximity between East Burke (the Post Office Box to which U.S. currency was sent in exchange for bitcoin), and St. Johnsbury (the return address for the LSD supplied by 2happytimes2).

### c. Vermont-Specific Investigation

With the above-information in hand, Vermont-based HSI agent Jamie West, and Postal Inspector Jonathon Dunham began their local investigation. On Friday, March 16, 2018, employees of the East Burke, Vermont post office reported that a large quantity of Priority Mail shipping boxes (of the sort in which the HSI-purchased LSD arrived) had been ordered and received at PO Box 22.

On Monday, March 19, 2018, HSI Agent Jamie West conducted surveillance at 3585 Darling Hill Road, and observed a Rhode Island-registered (license plate CN117) gray Honda Accord and Blue Honda CRV bearing Vermont license DSK573 (registered to Tracy Baker) in the driveway.

The next day, March 20, Agent West observed the same blue CRV both at the Darling Hill Road residence, as well as the East Burke post office (where Agent West also observed a white female who fit the description of Tracy Baker).

Later on March 20, Agent West inquired of the East Burke Postmaster regarding PO Box 22. The Postmaster advised that PO Box 22 received multiple international mail parcels, typically small and square, as well a larger parcels from California. An East Burke postal clerk, who worked at other post offices in the area, also advised that while he had not seen Baker mail parcels from East Burke, he had seen Tracy Baker mail parcels from other nearby post-offices, including North Concord, and Lyndonville.

The Postmaster also advised that she had never seen Sam Bent (the addressee for two of the four undercover bitcoin currency exchanges), but had seen a woman who described herself as the sister of Tracy Baker's boyfriend. The Postmaster stated this woman was possibly African American. The East Burke Postmaster also advised a shipment from Poland had arrived for PO Box 22 the previous day.

The Homeland Security and Postal Inspection agents conducted additional interviews with postal employees in West Burke, Lyndonville, and St. Johnsbury. The employees could not recall any suspicious encounters with Sam Bent or Tracy Baker. However, the carrier for the postal route that included 462 Railroad Street in St. Johnsbury (the return address for the HSI-ordered LSD) advised that he did declined to deliver mail addressed to a William Currier at that address, which was a multi-unit apartment building, because he (the carrier) doubted that anyone by that name lived there.

On Friday, March 23, 2018, an employee of the Orleans, Vermont post office reported to Postal Inspector Dunham that the previous day, March 22, a woman mailed eight parcels from Orleans that bore fictitious return addresses, and the parcels had shipped the previous night. Postal employees knew the return addresses to be fictitious based on their familiarity with the addresses in the area.

### d. Identification of Djeneba Bent.

On Monday, March 26, 2018, the East Burke Postmaster advised Inspector Dunham by email that the name of the woman who picks up mail for PO Box 22 was Djeneba Bent. The Postmaster advised Djeneba Bent pronounced her name as "Geneva," wore glasses, and did not have an accent. The Postmaster also confirmed that Djeneba Bent drove a grey sedan, possibly with a New Hampshire

plate that could be DW117.  (Bent's gray Accord actually had a Rhode Island license CN117.)

The postmaster also passed on a photograph that she had obtained from the internet of Djeneba Bent.  Agent West obtained a DMV photo of Djeneba Bent. On September 26, Agent West showed the DMV photo to the Orleans Postal Employee who had reported the eight parcels with fictitious return addresses.  The employee stated he was 95 percent sure that Djeneba Bent was the person who had shipped those suspicious packages.

### e.  Trash Inspection from 3585 Darling Hill Road

The day after Djeneba Bent was identified by the East Burke Postmaster, March 27, 2018, Agent West and Inspector Dunham conducted an inspection of the trash that the occupants of the Darling Hill Road residence had left near their driveway for collection.   The trash contained the following suspicious matter:

- A U.S. Priority Mail shipping envelope addressed to "The Lovely Djeneba Bent" at PO Box 22;

- Three used rubber gloves;

- Three shipping envelopes that had shipped from Spain, two addressed to a location in the state of Georgia, and one addressed to Sam Bent at PO Box 22;

- Two Amazon shipping envelopes addressed to Sam Bent at the Darling Hill residence;  and

- A clear plastic bag containing a white powder residue.[6]

In addition to the drug-related evidence (rubber gloves, bag with powdery residue), this trash search further confirmed that Djeneba Bent likely resided at 3585 Darling Hill Road, and was associated with PO Box 22.

### f.   Dissemination of Information About Djeneba Bent.

On March 28, Inspector Dunham forwarded the information supplied by the East Burke postmaster regarding Djeneba Bent, as well as the DMV photo obtained by Agent West to other post offices in the vicinity of East Burke, and asked to be alerted if Bent came to their post offices to conduct business.   The Postal Inspection Service heard from postal employees in Danville, West Burke, Lower Waterford, Lyndonville, and St. Johnsbury, as well as Littleton, New Hampshire that Bent had mailed multiple parcels from these locations.  Inspector Dunham also confirmed that some of the return addresses on these parcels belonged to persons on a publicly available sex offender registry.

### g.   Extended Border Search of Two Parcels From Spain Addressed to PO Box 22

---

[6] The plastic bag with the white powder residue was provided to the Vermont forensic lab for analysis.  On April 2, 2018, Forensic Chemist Wendy Alger issued a written report stating the white powder was not a controlled substance.  The information in that report was not conveyed to Agent West, until April 4.  *See* Exhibit 1, hereto (email from Vermont forensic lab to Agent West).

Also on March 28, 2018, agents learned that two international mail parcels, from Spain, had arrived at the East Burke, Vermont post office, addressed to Sam Bent at PO Box 22 in East Burke. These parcels appeared very similar to three of the envelopes found during the search of the trash from 3585 Darling Hill Road.

On March 29, 2018, Agent West, in the presence of Inspector Dunham conducted an extended border search of these parcels. The reasonable suspicion supporting this search included the following information:

- HSI had conducted thousands of dollars of undercover bitcoin laundering transactions, which included shipping United States currency to Sam Bent at PO Box 22, the same address as on these packages;

- That PO Box 22 had acquired a large quantity of Priority Mail packaging, consistent with online distribution operation;

- That a resident of the Darling Hill Road residence associated with PO Box 22 travelled around to several different post offices in proximity to the East Burke in order to mail several Priority Mail parcels, several of which bore fake or fabricated return addresses;

- A search of the trash from the residence associated with PO Box 22 revealed rubber gloves (consistent with drug processing and/or an effort to conceal fingerprints), other international envelopes, and a plastic bag

containing an unknown white powder that had been delivered to lab for

testing.

The international packages addressed to Sam Bent from Spain contained vacuum-

sealed bags containing a dark thick substance.  A photograph of one of these

containers is below:



Based on the appearance of this substance, and the manner by which it was

packaged, Agent West and Inspector Dunham believed it was highly likely that the

contents of the international packages contained unlawful controlled substance.

Because of concerns for agent safety relating to the testing of unknown

controlled substances, the agents enlisted the assistance of Vermont State Police

(VSP) Sergeant Sean Loan, of the VSP Narcotics Investigation Unit, for field-testing. VSP facilities have tools to protect agents from inadvertent exposure to dangerous controlled substances, such as fentanyl, during field tests. Sean Loan performed the field test, as witnessed by Agent West and Inspector Dunham. When a portion of the unknown dark thick substance from the international parcel was subject to the test kit, the kit, as witnessed by the agents present, turned to the color indicating the presumptive presence of heroin.

### h. The Search of the Packages Mailed from Danville, Vermont

In response to the March 28 dissemination of information about Djeneba Bent, on March 29, Inspector Dunham also learned that Djeneba Bent had mailed six parcels from the Danville, Vermont post office, all listing a return address of William Currier, 462 Railroad Street, St. Johnsbury, Vermont. This was the same return address that had been on the shipment of LSD that HSI had received from the "2happytimes2" dark web vendor on March 13. As noted above, the carrier responsible for 462 Railroad Street did not deliver mail if it was addressed to William Currier because the carrier doubted that anyone by that name lived there.

On April 3, 2018, Dunham applied for and obtained a search warrant to search the six parcels mailed by Djeneba Bent from the Danville post office bearing the fake return address that matched the address on the LSD shipment.

The affidavit in support of this search warrant (document no. 22-1, filed with the motion to suppress) contained the following information:

(1) a large quantity of Priority Mail shipping boxes had been ordered and received at PO Box 22;

(2) PO Box 22 was registered to Tracy Baker, at 3585 Darling Hill Road, and authorized "Sammy Bent" was authorized to accept mail there;

(3) Baker's registered vehicle was observed at the Darling Hill residence;

(4) mail addressed to "Djeneba Bent" was also received at PO Box 22;

(5) Tracy Baker was known to a postal employee to accept mail at PO Box 22, but to send parcels from other post offices in the area;

(6) A woman matching the DMV photograph of Djeneba Bent had recently mailed eight parcels from the Orleans post office with fictitious return addresses;

(7) an inspection of the trash from 3585 Darling Hill Road showed that it contained, mail addressed to Djeneba Bent, as well as a plastic bag containing an unknown white powder residue (which had been sent to the lab for testing)[7];

---

[7] As noted above, at footnote 1, the results of that testing had not been received as of April 3, 2018.

(8) in response to a the circulation of a photo of Djeneba Bent among to post offices near East Burke, Inspector Dunham learned she mailed multiple packages from at least six post offices in the area;

(9) at one of those post offices, Djeneba Bent drove a Honda Accord that had been observed in the driveway of the Darling Hill Road residence;

(10)    during the previous month, HSI had purchased LSD from a dark web vendor in exchange for bitcoin, and the return address for that LSD-containing parcel was William Currier at 462 Railroad Street, St. Johnsbury, the same return address on the six parcels for which the search warrant was sought;

(11)    the mail carrier responsible for 462 Railroad Street had declined to deliver mail to William Currier at 462 Railroad Street because he doubted anyone by that name lived there;

(12)    some of the parcels that Djeneba Bent had mailed from other post offices contained the names of persons on the sex offender registry, in an apparent effort to conceal the real identity of the sender of those packages;

(13)    and that Inspector Dunham knew from his training that:

    a.  Priority Mail is a common method for shipping unlawful controlled substances;

b.  such drugs (or proceeds) are often found during parcel
    investigations;

c.  drug dealers often use false, or dated, information in labeling the
    parcels in an effort to effort to avoid association with the unlawful
    shipments.

It was also clear from the affidavit that there was no non-nefarious reason
for Bent to use different post offices other than the post office from which she
obtained her own mail in order to send mail.  In addition to the probable cause-
establishing information in this paragraph, the April 3 search warrant application
also explained that on March 29, Inspector Dunham and Agent West searched two
international parcels (from Spain) addressed to PO Box 22, pursuant to an
extended border search.  The dark, thick substance found in these packages was
field tested by Vermont State Police Sergeant Sean Loan.  The result was
presumptively positive for heroin.

In summary, the application for the warrant to search the six Danville
parcels explained, (1) that they had been shipped by a woman who appeared to live
at the Darling Hill Road residence; (2) that residence was associated with the
acquisition of a large quantity of Priority Mail supplies; (3) that residence was also
associated with a recently discarded plastic bag containing a suspicious white-
powder residue (that had been sent to the lab for testing) and rubber gloves; (4) the

return address on the six packages was not only apparently false, but was also the same return address found on a shipment of LSD that had been obtained by HSI; (5) the sender of the parcels used at least six other post offices in or near the Northeast Kingdom to mail parcels (at least some of which appeared to have fabricated return addresses); and (6)this behavior was all consistent with drug trafficking through the mail.

The six parcels searched pursuant to the April 3 search warrant contained, among other items, substances that field-tested positive for marijuana, and a white powder initially thought to be heroin. These items were found within packaging labeled "organic dried fruit" that matched the packaging (shown above on page 8 in which the HSI-acquired LSD had arrived).

Below is a photograph of one of the packages searched pursuant to the April 3 search warrant:



The "organic dried fruit" labeling on the marijuana and MDMA packaging discovered on April 3, was nearly identical to that on the LSD purchased in March from 2happtimes2 (a photograph of which is on page 8), further confirming the connection between the residents of 3585 Darling Hill Road, including Djeneba Bent, and the crimes under investigation.

### i.  The Search of 3585 Darling Hill Road.

On April 9, 2018, Agent West applied for and was granted a search warrant to search the premises and electronic devices present at 3585 Darling Hill Road, in East Burke, Vermont.  The affidavit in support of that application, filed as Defendant's Exhibit C in this docket as document 22-1, at 6-24, contained the following information:

(1) the information contained in the application to search the six parcels mailed by Djeneba Bent with the William Currier, 462 Railroad Street return address;

(2) the information received from the Vermont forensic lab indicated the suspicious white powder found in a plastic bag during the trash search was not a controlled substance;[8]

(3) the results of the search conducted pursuant to that warrant, including the discovery of marijuana and suspected heroin within packaging labeled "organic dried fruit";

(4) that the LSD purchased from 2happytimes2 over the dark web by HSI in March 2018 had arrived in the same "organic dried fruit" packaging;

---

[8] This information was relayed to federal agents from the lab on April 4, 2018.  See footnotes 1 & 2, above, and exhibit 1 hereto.  The motion to suppress, quoting from an HSI report of investigation, understandably contends the information was conveyed on April 2.  That was the date of the lab report.  The information in that report was not conveyed until April 4.

(5) that Djeneba Bent, the sender of the contraband-containing packaging, appears to reside at the Darling Hill Road residence, and had received mail addressed to her at PO Box 22.

The April 9 warrant was executed on April 10, and resulted in the seizure of computers used to access the vendor pages of 2happytimes2, as well as the dark web pages associated with the bitcoin-sales to HSI. Agents also found additional quantities of LSD, MDMA, cocaine, and marijuana, as well as several "organic dried fruit" labels.

### j. Interview of Sam Bent.

During the execution of the search warrant, agents interviewed Sam Bent. The interview was conducted within the mudroom inside Darling Hill residence while agents were searching the premises. Bent was not restrained. He was not handcuffed. He was told that he was not under arrest, and was not going to be arrested that day. He was not threatened in any way. He was advised about the potential benefits of cooperation, but no promises were made. Agents did not raise their voices, and their weapons were not brandished. A transcript of the interview is filed herewith, subject to a motion to seal, as Exhibit 2.

During the interview, Sam Bent substantially admitted to the offense charged in the indictment, including the use of dark web markets, specific usernames, the sale of specific drugs, and the use of bitcoin.

He was interviewed again two days later.  A transcript of this interview is also filed herewith as Exhibit 3, subject to a motion to seal.

### k.  Additional Search Warrants to Search Mail Parcels.

On April 17, 2018, Inspector Dunham applied for and obtained a warrant to search 90 parcels associated with Sam and Djeneba Bent.  The affidavit in support of the application for this warrant contained the following information:

(1) the information supplied to the Court in the April 3 search warrant applications;

(2) the results of the execution of the April 3 and April 9 search warrants, including:

    a.  the discovery of marijuana and suspect heroin (which Sam Bent later admitted was MDMA) mailed by Djeneba Bent from the Danville post office;

    b.  the identical "organic dried fruit" labeling found on the parcels searched pursuant to the April 3 warrant, and the March 13 undercover purchase of LSD from 2happytimes2;

    c.  Sam Bent's admission that Djeneba Bent distributed controlled substances in conjunction with Sam Bent at various post offices near or around the Northeast Kingdom; and

   d.  the provenance of each of the 90 parcels to be searched, showing

       either that Djeneba Bent had mailed them from various post offices

       near or around the Northeast Kingdom or that they had arrived

       addressed to PO Box 22, and fit a description provided by Sam

       Bent for controlled substances he was expecting to receive.

It should be noted that the April 17 search warrant application, while attaching and

incorporating the affidavit in support of the April 3 search warrant application,

failed to note that the white powder residue found during the trash pull eventually

tested negative for controlled substances.  However, in light of the fact that the

April 17 application contained information showing that Sam and Djeneba Bent

had conspired to distribute controlled substances through the mail, including the

results of the April 3 search of six parcels and the April 10 search of 3585 Darling

Hill Road, there was an abundance of information supporting a finding of probable

cause without regard to the white powder found during March 29, trash pull.

       The warrant was executed on April 19.  The search turned up approximately

four packages containing cocaine, approximately eight packages containing LSD,

approximately 19 packages containing MDMA, approximately 60 packages

containing hashish or marijuana – all having been mailed by Djeneba Bent.  The

search also revealed approximately 200 grams of MDMA and 80 grams of cocaine

having been mailed to PO Box 22 for redistribution.

## II.    The Pending Charges

On May 24, 2018, the Grand Jury returned a ten count Indictment charging Sam and Djeneba Bent with one Count of conspiring to distribute controlled substances over the dark web.

Counts Two through Six charge Sam Bent with violations of 21 U.S.C. § 841(a)(1), relating to his sale of LSD to HSI, as well as is possession with intent to distribute, and distribution of, LSD, Cocaine, and MDMA on other occasions. Counts Seven through Ten charge Sam Bent with money laundering violations relating to his sales of bitcoin drug proceeds.

## III.    Argument

In his motion to Suppress Sam Bent seeks suppression of most, if not all, of the evidence obtained after the involvement of the Vermont based law enforcement agents.

### a.  The Extended Border Search of Two Parcels from Spain Was Supported by Reasonable Suspicion.

Bent first argues that the March 29 extended border search of the two parcels from Spain addressed to him was unconstitutional.  Mot. at 2-4.  He principally argues that agents lacked the reasonable suspicion required for the extended border search rule to apply.  As shown below, several data establish there was ample reasonable suspicion to support the constitutionality of the search.

It is well-settled that customs agents may search containers entering the United States without a warrant for any reason. *United States v. Garviria*, 805 F.2d 1108, 1112 (2d Cir. 1986). After a parcel has travelled further into the Country, it may be subject to an extended border search. The Fifth Circuit has explained the extended border search as follows:

> three factors must be demonstrated before an extended border search is deemed reasonable and hence constitutionally permissible: (1) a showing of a "reasonable certainty" or a "high degree of probability" that a border crossing has occurred; (2) a showing of a "reasonable certainty" that no change in the condition of the person or vehicle being inspected occurred from the time of the border crossing until the search and that the contraband found was present when the person or vehicle crossed the border; and (3) a showing of a "reasonable suspicion" that criminal activity was occurring.

*United States v. Cardenas,* 9 F.3d 1139, 1148 (5th Cir. 1993). *See also United States v. Garviria*, 805 F.2d 1108, 1112 (2d Cir. 1986) ((Once a parcel has passed initial customs, a warrantless search is still permissible so long as there is reasonable suspicion that it will contain evidence of a crime.)

Bent's only challenge is to the presence of reasonable suspicion that criminal activity was occurring. "Reasonable suspicion is a less demanding standard than probable cause[.]" *Alabama v. White*, 496 U.S. 325, 330 (2d Cir. 1990). Like probable cause, the reasonable suspicion is a "commonsense, nontechnical conception that deal with 'factual and practical considerations of everyday life.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (citation omitted). Reasonable

suspicion is "simply [] 'a particularized and objective basis' for suspecting the [] criminal activity." *Id.* at 696 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

As the above recitation of the background of this investigation shows, as of March 29, 2018, there were several objective indicators that that Sam Bent, and others associated with PO Box 22 in East Burke, were involved with the unlawful distribution of drugs through the mail.

As of March 29, 2018, the following information was known to law enforcement:

- HSI had conducted several online, dark-web, exchanges of bitcoin for U.S. currency by mailing currency either to Sam Bent at PO Box 22, or to Sam Bent's mother in Massachusetts;

- On March 13, 2018, HSI received from "2happytimes2" a Priority Mail parcel containing LSD that HSI had ordered through the dark web marketplace from 2happytimes2 with a St. Johnsbury, Vermont return address;

- dark web forensics indicated that the seller of LSD and the seller of bitcoin in the above-described transactions was the same person;

- PO Box 22 had ordered and received a large quantity of Priority Mail boxes, of the sort used to ship the LSD to HSI;

- Djeneba Bent regularly received mail addressed to PO Box 22 in East Burke;

- Djeneba Bent had also shipped several Priority Mail parcels from several different post-offices in and around the North East Kingdom, including several that had fake return addresses, a practice for which there was not non-nefarious explanation;

- Djeneba Bent appeared to live at the 3585 Darling Hill Road residence associated with PO Box 22;

- an examination of the trash from that residence showed envelopes from other parcels shipped from Spain (to an address in Georgia), suggesting a re-distribution of parcels from the sender, consistent with drug distribution; and

- the trash search also turned up rubber gloves, consistent with drug packaging, as well as, a white bag containing a suspicious white powder residue.

In short, on March 29, agents had an abundance of information from which justified a reasonable suspicion that Sam and Djeneba Bent were involved in dark-web-based drug distribution through the mail, including the receipt of international parcels.

Bent contends that reasonable suspicion was lacking because "none of the accepted drug smuggling/drug package profile factors to establish reasonable suspicion to search a parcel for are present here." Mot. at 22. He contrasts this case to a case that preceded the internet, and to another in which an agent relied on more years of experience than Inspector Dunham has. Mot. at 23. However, these arguments ignore the rule that it "is not possible" to articulate what constitutes reasonable suspicion with precision. *Ornelas*, 517 U.S. at 695. They also ignore that drug distribution over the dark web using bitcoin is very different than in the days before these technologies. Finally, these arguments also ignore that Inspector Dunham was not acting alone. Hearing evidence will establish that Agent West has extensive experience that informed his conclusion regarding the presence of reasonable suspicion.

The Court should reject Bent's challenge to the extended border search of the parcels addressed to him from Spain.

### b. The Identification of Djeneba Bent Was Reliable and Constitutional.

*Sam* Bent seeks to suppress the manner by which law enforcement confirmed the participation of *Djeneba* Bent in the charged conspiracy. Sam Bent contends that law enforcement asking postal employees if they recognized Djeneba Bent by reference to a photo of Djeneba Bent was unduly suggestive. Mot. at 5-8.

31

### i. Sam Bent Lacks Standing to Challenge the Manner of Djeneba Bent's Identification.

At the outset, Sam Bent lacks standing to challenge the manner by which Djeneba Bent was identified.  Sam Bent points to no case involving a challenge to the identification of a person other than the defendant making the challenge.  Furthermore, the Second Circuit has ruled that a criminal defendant lacks standing to assert the due process rights of a third person – even the defendant's spouse – in a suppression motion.  *United States v. Anderson*, 772 F.3d 969, 975 (2d Cir. 2014).  Similarly, here Sam Bent lacks standing to challenge the manner by which Djeneba Bent was identified.  Nevertheless, as shown below, the argument should also be rejected on the merits.

### ii. Djeneba Bent Was Identified by Reference to Her Unique Conduct and Name.

"Reliability is the linchpin in determining the admissibility of identification testimony."  *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977).  A defendant may be denied due process of law if the circumstances of a witness's identification of the defendant was "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

The facts of this case make clear that Djeneba Bent was principally identified by her unique name and conduct – circumstances that do not risk misidentification.  As explained above, Agents interviewed the East Burke

Postmaster on March 20, 2018 regarding PO Box 22 at the East Burke post office. This address was purchased by Tracy Baker. "Sammy Bent," among others, was authorized to receive mail at PO Box 22. This was also the address to which to which $3,200 in cash had been mailed by HSI as part of the undercover bitcoin exchange operation.[9] In addition to confirming that this address received international parcels, the Postmaster also explained that a woman claiming to be the sister of Tracy Baker's boyfriend had come into the post office. The Postmaster described this woman as "possibly African American."

At about 7:44am on March 26, the East Burke Postmaster sent an email to Inspector Dunham. The Postmaster advised Inspector Dunham of a package that had arrived for PO Box 22, and explained the package provided the "name [of the female] that sometimes picks up the mail." A portion of the image of the package forwarded by the Postmaster is below:



---

[9] As part of the same operation HSI also mailed $11,000 to Rosemarie McCrae, the apparently unwitting mother of Sam Bent in Somerset, Massachusetts.

Later that morning, at approximately 10:45am on March 26, 2018, the East Burke Postmaster emailed Inspector Dunham again, this time stating: "The package for PO Box 22 was just picked up by Djeneba Bent—pronounce as 'Geneva'. She wears glasses and doesn't have any accent. She was driving a grey sedan, possibly a Toyota, with New Hampshire plate believed to be DW117."[10]

About 10 minutes later, on March 26, at about 10:55am, the East Burke postmaster followed up with another email reading, "This is a picture of Djeneba Bent that we were able to bring up on line." Attached to the 10:55 email was a Facebook photo that of Djeneba Bent.

By reference to the name Djeneba Bent, HSI was able to obtain a DMV photo of Djeneba Bent. The DMV photo was shown to a clerk in the Orleans post office. Hearing testimony is anticipated to show that the Orleans postal clerk had been previously shown a photograph of an African American female known to HSI to have been involved in the distribution of controlled substances in the area. The clerk advised that she did not recognize the female in the first photograph. In response to the image of Djeneba Bent, however, the clerk advised she was 95 percent sure it was the same woman who had mailed parcels with fake return addresses from his post office.

---

[10] As noted above, on March 20, Agent West had observed a gray Honda Accord, with a Rhode Island license plate CN117 in the driveway of 3585 Darling Hill Road.

The above information was then disseminated to nine postmasters with post offices within an hour's drive of East Burke, advising that the Postal Inspection service wished to be advised if Bent was mailing parcels.  As noted above, the Postal Inspection Service heard from postal employees from at least six different post offices that Bent had tried to mail several parcels from each post office.

Sam Bent appears to argue that rather than disseminating Djeneba Bent's image, law enforcement should have instead used a photo lineup.  That suggestion is unrealistic and impractical.  It would have been highly unusual and counterproductive for an inspector to tell post offices to alert the inspection service if someone on a photo array walked into their post office.  Furthermore, in light of the fact that the parcels mailed by Bent from these other post offices contained the same packaging, including the "organic dried fruit" labels as found with the LSD obtained by HSI on March 13, it is clear that the dissemination of the photos of Bent did not result in the misidentification of a person involved in this conspiracy.

As these facts demonstrate, Djeneba Bent came to the attention of law enforcement only *after* the East Burk post office received mail addressed *to her* at PO Box 22 *and* she came to the post office to collect that mail.  During that visit, she confirmed her name and how it was pronounced.  Without additional prompting, the *witness*, and not law enforcement, provided a photograph of

Djeneba Bent.  The only thing suggestive about the manner by which Djeneba

Bent was identified was that Djeneba Bent self-identified as a user of PO Box 22.

Sam Bent's argument that Djeneba Bent was identified by a different by a

"photo show-up," mot. at 4-5, is factually incorrect.  The East Burke post office

identified Bent by her conduct and name, and supplied a photo of her.  That photo

was then shared with the Orleans postal employee who previously failed to

recognize a different woman's photograph.

Furthermore, even if this process could somehow be deemed "suggestive" it

was not "unnecessarily suggestive" in the given situation.  Agents desired to

intercept packages shipped by Djeneba Bent, who was confirmed to associated

with PO Box 22.  It would have been impractical to share a photo line-up to

various post offices with the instruction to let agents know if one of the people in

the line-up appeared in their post office.

The challenged identification procedure, therefore, neither suggestive or, if

suggestive, unnecessarily so.  A show up procedure may not be "unnecessarily"

suggestive when an officer seeks a quick confirmation from a witness whether a

detained suspect is the correct individual.  *See, e.g., Briso v. Ercole*, 565 F.3d 80,

88-89 (2d Cir. 2009); *see also United States v. Bautista,* 23 F.3d 726, 730 n.6 (2d

Cir. 1994) ("[R]ather than excoriate the law enforcement officials involved for

conducting an unduly suggestive procedure, one might commend them for their immediate efforts to ascertain and release innocent people.").

Even if the Court finds that the identification procedure was "unnecessarily" suggestive, suppression of identification testimony is not compelled. *Maldonado-Rivera,* 922 F.3d at 973. Unless there is a substantial likelihood of irreparable misidentification from the process employed, the untrustworthy aspects affect the weight, not the admissibility, of the identification. If the identification is independently reliable, it may be admitted despite the suggestiveness of the procedure, leaving counsel to argue the persuasive effect of the identification to the trier of fact. Among the non-exclusive factors to be considered in determining independent reliability are: "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Further, not all of the listed factors need to weigh in the government's favor for the challenged identification to be admissible.

The identification of Djeneba Bent as a member of the charged conspiracy is plainly reliable. She was present at 3585 Darling Hill Road during the April 10 search of that residence. The packages shipped by her contained the same "organic

dried fruit" packaging as contained the HSI-purchased LSD, and Sam Bent has

confirmed her participation in the shipping operation.

### c. The Applications for Search Warrants Did Not Contain Material Misinformation, and Established Probable Cause Even Without Regard to the Portions Bent Challenges.

As noted in the above factual recitation, agents obtained three search

warrants leading to the arrest of Sam Bent.  On April 3, they obtained a warrant to

search six parcels mailed by Djeneba Bent from the Danville, Vermont post office.

On April 9, 2018, agents obtained a warrant to search the Bent residence on

Darling Hill Road in East Burke, Vermont.   And on April 17, they obtained a

warrant to search 90 parcels, some of which were suspected to have been mailed

by Djeneba Bent, and some of which were addressed to Sam Bent at P.O. Box 22.

Sam Bent argues that the applications in support of each warrant contain

material omissions of information or incorrect information which, if included or

corrected, would have resulted in the warrant not issuing.  As shown below, these

arguments are wrong on several levels, and should be rejected without a hearing.

### i. The Legal Standard.

In *Franks v. Delaware,* the Supreme Court held that there is "a presumption

of validity with respect to the affidavit supporting the search warrant." 438 U.S.

154, 171 (1978).    To be entitled to a hearing, the defendant must "make[] a

substantial preliminary showing that a false statement knowingly and intentionally,

or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [] the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56.

Furthermore, the Court in *Franks* held that:

> [t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

*Id.* at 171.

To ultimately prevail at a *Franks* hearing, "a defendant 'must show by a preponderance of the evidence that the affidavit contained false statements that were material on the issue of probable cause.' The defendant must further show that the alleged false statements were made 'intentionally, knowingly, or with reckless disregard for the truth.'" *United States v. Wapnick*, 60 F.3d 948, 955 (2d Cir. 1995) (internal citations omitted).

In determining whether a misstatement or omission made intentionally or with a reckless disregard for the truth was material to the probable cause determination, a court must determine whether "the untainted portions of the application are sufficient to support the probable cause or necessity findings," and if so, "then the misstatements are not 'material' and suppression is not required." *United States v. Rajaratnam,* 719 F.3d 139, 146 (2d Cir. 2013) (affirming denial of a *Franks* challenge); *see also United States v. Canfield*, 212 F.3d 713, 718 (2 Cir. 2000) ("If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate."); *United States v. Thomas,* No. 5:12–cr–37, 2013 WL 6000484 at *21 (D. Vt. Nov. 8, 2013) (a warrant is invalid "only if the affidavit as supplemented by the omitted material could not have supported the existence of probable cause"). As such, "minor errors in an affidavit are not cause for invalidating the warrant that it supports." *United States v. Waker*, 534 F.3d 168, 171 (2d Cir. 2008).

Applying this well-settled standard to the challenged applications, the Court should decline to hold an evidentiary hearing and uphold the validity of the challenged warrants, each of which was supported by ample data establishing probable cause.

### ii. The April 3 Affidavit.

Sam Bent asserts the application in support of the April 3 warrant to search six parcels mailed from Danville, Vermont by Djeneba Bent, all bearing the same false return address that was used in the mid-March shipment of LSD to HSI, was deficient for the following reasons:

- the affidavit failed to state that the white powder residue seized during the trash pull had tested negative for controlled substances;

- the affidavit failed to state that the LSD acquired by HSI undercover officers had not been field tested and that HSI had not previously purchased LSD (or other drugs) from 2happytimes2 previously; and

- the affidavit failed to state that the field test used to test the substance found in the March 29 extended border search was conducted in a manner that Sam Bent asserts was improper.

Mot. at 10-11. As explained below, each assertion is premised on an incorrect understanding of the facts. Furthermore, the affidavit established probable cause even if the challenged information was included. Accordingly, there is no reason under *Franks* for an evidentiary hearing relating to the April 3 search warrant.

### 1. The White Powder.

Bent claims that the affidavit in support of the April 3 warrant was deficient because it failed to state that the Vermont forensic lab had determined on April 2

that the white powder residue discovered in a plastic bag during the March 27 trash

search, had tested negative for controlled substance.    As explained above, at

footnotes 1 and 2, and Exhibit 1 hereto, federal agents did not learn about the lab

tests until April 4.  Accordingly, Sam Bent cannot show that the April 3 affiant

provided any information about the status of the white powder in reckless

disregard for its truth.

But even if the affidavit had stated the white powder had tested negative for

controlled substance, it is well known that drug distributors use a variety of

powders to dilute, or "cut," the powdery drugs they are selling.  Accordingly, the

presence of a white powder residue found within a plastic bag within the 3585

Darling Hill Road trash pull was supportive of probable cause whether or not the

powder was a controlled substance.

Accordingly, the affidavit accurately reflected information known to the

affiant regarding the white powder, and even if the affidavit contained the

additional information learned the following day, the affidavit still established

probable cause.

## 2.  The Status of the LSD.

Sam Bent also complains that the April 3 affidavit did not state that the LSD

obtained by HSI agents from 2happytimes2 in a package bearing the same return

addresses as the six packages that were the object of the April 3 affidavit had not

been field-tested.   The affidavit described the LSD acquisition as follows:

> According to Agent West, HSI in NY were conducting an undercover
> investigation involving the online order and purchase using bitcoin, of
> approximately $70 worth of Lysergic Acid Diethylamide (LSD).  On
> March 13, 2018, in response to an order placed by an undercover HSI
> agent as part of the investigation, Special Agents (SA) with HSI in
> NY seized a mail parcel containing suspected LSD blotter paper tabs.
> The return address on the label was William Currier 462 Railroad St.,
> Saint Johnsbury, VT 05819.

Sam Bent claims that the affidavit was deficient because it omitted that HSI

agents were unable to field test the LSD acquired during this undercover operation.

Bent asserts, without any support, "there was/is no credible evidentiary basis for

agents to suspect the paper tabs contained LSD."  This assertion is incorrect

because the absence of a field test did not undermine the agent's good faith

suspicion (later proved correct by a lab test) that the substance obtained on line

was LSD.  Critically, the affidavit does not claim the substance was field tested,

and described the substances as "suspected LSD" acquired with bitcoin, and that

the suspect drugs came in a package with the same return address as those that

were the object of the April 3 application.   As shown above, these statements were

wholly accurate.  The LSD was acquired from the dark web in response to a

webpage touting "acid" and "LSD."  There is no conceivable explanation for the

substance acquired other than it was suspected LSD, and the affidavit was

completely accurate in its description of the state of the investigation.

Furthermore, even if the affidavit had added a statement to the effect that a lab test was pending, such a statement would in no way lessen the probable cause-establishing nature of the information: the six parcels to be searched bore the same return address as the suspected LSD-containing parcel received by HSI less three weeks earlier.

### 3. The Border Search Field Test.

Sam Bent claims that the April 3 affidavit "falsely stated that the substances seized in the extended border search field tested positive for heroin and made material omissions regarding said field tests." This argument should be rejected for several reasons. First, VSP Sergeant Loan, assigned to the Narcotics Investigation Unit of the VSP, conducted the field test and concluded it was presumptively positive for heroin. Agent West and Inspector Dunham both witnessed the test and observed the color reaction that occurred when the thick dark substance was subject to the reagent. Agent West, Inspector Dunham and Sergeant Loan all witnessed the test kit change the color indicated for heroin. Defendant's exhibit F, filed with the motion to suppress, doc. 22-1, at 54, a portion of which is below shows just that:



There are, therefore, therefore no false statements contained in the April 3 affidavit regarding the administration of the field test, or its outcome.  Indeed, Bent concedes, mot. at 12, both that a positive field test result for heroin presents as purple, and that the photo of the field test here shows a "very dark purple."

Apparently conceding the positive field test, Bent also claims that the April 3 affidavit should have stated that the field test employed by the VSP "would produce unreliable results and false positive results."  However, Bent provides no explanation as to why Inspector Dunham should have doubted the acumen of Sergeant Loan or the accuracy of the field test.   Bent argues that Sergeant Loan

used the wrong field test by pointing to brochures and newsletters produced by the test manufacturer that appear to detail the best test to use for particular types of drugs. That argument puts the cart before the horse: agents used the field test because they did not know what drug, if any, was contained within the thick dark substance. (Subsequent lab testing confirmed the presence of morphine and codeine.) Indeed, the whole purpose in using a field test is to ascertain what the substance may be. VSP cannot be faulted for using a field test to try to ascertain the nature of the unknown substance before it. And Inspector Dunham cannot be faulted for stating in his affidavit what the results of that test were.

Alternatively, a review of the April 3 affidavit shows that it amply established probable cause without mention of the outcome of the field test conducted on the parcel from Spain. Without that information, the application still established that (1) there were six parcels bearing the same fictitious return address that had been on the suspected LSD purchased undercover by HSI about three weeks earlier, (2) the shipper of these parcels, Djeneba Bent, had mailed parcels from several post offices in or near the Northeast Kingdom, including parcels bearing fake return addresses, (3) PO Box 22, which was associated with the Bent residence, had recently received two parcels from Spain containing a dark, thick substance, (4) the trash from that residence included rubber gloves, as well as a plastic bag containing a white powdery residue, and (5) PO Box 22 had ordered

and received a large quantity of Priority Mail boxes. Inspector Dunham's affidavit explained that these data were consistent with Djeneba Bent being involved in online drug distribution through the mail.

This information was plainly sufficient to establish probable cause without mention of the details of the field test, or its results.

Finally, Bent also re-asserts his challenge to the constitutionality of the extended border search. As shown above in section II.a. of this opposition, the extended border search was supported by reasonable suspicion and was therefore constitutional.

Bent has therefore failed to meet the threshold requirement for a hearing under *Franks v. Delaware.* He can point to no information that if corrected or absence of information that if included would have altered the facts establishing probable cause to search the six packages bearing the same fake return address that had been used to ship LSD three weeks before.

### iii.  The April 9 and April 17 Affidavits

On April 9 and April 17, 2018 Inspector Dunham sought and obtained warrants to search 3585 Darling Hill Road and 90 mail parcels connected to this investigation. With regard to these applications, Bent repeats (in footnote 4, mot. at 13) the same arguments relating to the absence of LSD field test, and the March

29 field test of the dark black substance sent to Sam Bent from Spain. As shown above, those arguments should be rejected.

Footnote 4 to Bent's motion also contends that both the April 9 and April 17 affidavits incorrectly state that five of the six parcels searched under the April 3 warrant were field tested. Bent is wrong. *See* Defendant's exhibit H, at ¶ 6 (recounting that three of the six parcels were field-tested); Defendant's exhibit I, at ¶ 11 (same). In any event, Bent does not claim his (incorrect) claim of error was material.

As noted above, at page 26, Bent is correct, in footnote 4 of his motion, where he states that the April 17 application failed to note that the white powder residue discovered during the trash pull had lab-tested negative for controlled substance. However, Bent does not suggest that omission was material to the overall presentation of facts establishing probable cause to search the 90 parcels. Nor could he, as the April 17 affidavit detailed, among other information, the results of April 3 and April 10 searches of the six "William Currier" parcels and 3585 Darling Hill Road, as well as some of Bent's admissions.

### d. Bent's Interviews Were Voluntary and Noncoercive.

Finally, Bent argues that his will was overborne when he was interviewed by agents within his home on April 10, 2018, and two days later on April 12.

In order to assess whether Bent's statements were voluntary, the Court should consider the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant factors include the location of the interview, the conduct of the interviewing agents, and the defendant's physical condition, among others.

The April 10 interview occurred at approximately 11:29am, within the mudroom of Bent's residence at 3585 Darling Hill Road. Bent was advised that he was not under arrest, Tr. 2, and that "you're not getting arrested today." Tr. 5. Bent was not restrained during the interview. Agents did not raise their voices or make any threats. The interview lasted about 90 minutes, and was conducted without any threats or promises. There is absolutely no suggestion that Bent's decision to speak with police was due to his will being overborne.

The April 12 interview occurred at the St. Johnsbury VSP barracks. Bent told Agent West that Bent would need a ride to the VSP, and Agent West obliged. During this interview, Bent was allowed to step outside, by himself, to take a break. Like the first interview, Bent was neither restrained nor threatened. The interview was conducted in calm manner. Again, there is nothing about the circumstances of the interview suggesting it was anything but voluntary.

Hearing evidence will include transcripts and recordings of these interviews. The hearing evidence will establish, contrary to Bent's arguments, he was not

fooled into providing information based on promises of leniency. It will also

reaffirm the correctness of this Court's analysis in *United States v. Corey Carter,*

No. 5:16-cr-76, Order on Defendant's Motion to Suppress Statements (February 9,

2017), slip op. at 6:

> [V]ague promises of leniency for cooperation" alone do not render a
> confession involuntary. *United States v. Corbett*, 750 F.3d 245, 253
> (2d Cir. 2014) (internal quotation marks omitted) (confession was
> voluntary after defendant chose to speak with detective after the
> detective's "assurance that he would 'treat [the defendant] like a
> Brother mason'"); *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir.
> 2002) (confession was voluntary after agent told the defendant that
> "he could benefit from cooperating in sting operations," but "nothing
> specific was promised," instead "agent simply said the prosecutor and
> the judge would be made aware of Gaines' behavior if it amounted to
> cooperation"); [*Unite States v.*] *Ruggles,* 70 F.3d at 264 (confession
> made during non-custodial interview was voluntary when, during
> interview, agent told defendant that it would be to his benefit "to
> cooperate and that his cooperation would be brought to the attention
> of the prosecutor"). Tricks and deception also do not necessarily
> render a defendant's statement involuntary. *See* [*United States v.*]
> *Anderson*, 929 F.2d at 99 ("Trickery does not make it impossible *per
> se* to find that a defendant voluntarily waived his rights."); *United
> States v. Jacques*¸744 F.3d 804, 812 (1st Cir. 2014) (officers may
> misrepresent the strength of the evidence they have against the
> defendant); *United States v. Ceballos*, 302 F.3d 679, 694-95 (7th Cir.
> 2002) (officers may misrepresent that an accomplice confessed and
> implicated defendant).

During the interviews, contrary to Bent's arguments, agents did not make

specific promises of leniency. For example, during the April 12 interview at the

VSP barracks, Bent argues he consented to a search of a parcel addressed to him

that he knew would contain MDMA only after agents promised "(1) there would be

no additional charge against him if MDMA is found in the parcel subject to search;

(2) he would not be charged with any single counts of possession of MDMA; and

(2) [he] would only be charged with conspiracy." Mot. at 19. In reality, the

exchange was as follows:

> MR. BENT: That's fine. If you guys want to take
> your time clearing up, I'll just go smoke a cigarette.
> SPECIAL AGENT WEST: Okay. Listen. One -- so,
> you have a package at the Post Office from Poland.
> MR. BENT: That's probably the MDMA.
> SPECIAL AGENT WEST: The MDMA you think?
> MR. BENT: Yeah.
> SPECIAL AGENT WEST: Okay. So, I filled this out.
> So, I'm going to -- I've got Sam Bent, and then me. Read it
> for yourself, but what I wrote is a partial from -- this is
>         the exact address –
>
> MR. BENT: Okay.
> SPECIAL AGENT WEST: -- on there. Addressed to
> Sam Bent, P.O. Box 22, East Burke, Vermont, zip code USA.
> And then if you agree with all this put -- go ahead fill out
> the bottom just like you did on the other form. Okay? Just
> make sure you read it though, okay?
> MR. BENT: Okay. So, this will be another charge
> once it comes in?
> SPECIAL AGENT WEST: Another charge?
> MR. BENT: This.
> SPECIAL AGENT WEST: No. I mean, it's all a big
> silly one package. I mean, so, you don't get another charge
> of possession of MDMA.
> MR. BENT: So, this makes it so I don't?
> SPECIAL AGENT WEST: Say it again?
> MR. BENT: This --
> SPECIAL AGENT WEST: No. All that does is so we
> can open that package and see what it was. So --
> MR. BENT: But then you open it, and you tell --
> or you add that to my other charges, right?

SPECIAL AGENT WEST: Well, no. I mean, we don't
add it to it, but it, it, it is all part of the same
investigation. We, you know, we seized MDMA yesterday.
MR. BENT: No. I know.
SPECIAL AGENT WEST: We're not going to -- so, you

don't get one count of MDMA or possession of MDMA and then
another count of possession of MDMA. If, if you are
charged, like we said, I mean, at some point, this -- we've
got to deal with this.
You know, with a charge or arrest or, you know,
whatever. It would be a conspiracy charge or a conspiracy
to possess a controlled substance or -- but --
MR. BENT: It is --

Tr. at 135-37.  Agent West accurately stated that the discovery of MDMA in the

parcel addressed to Bent would not result in an extra-charge against Bent (and it

has not resulted in such a charge).  Agent West did not promise Bent that Bent

would not be charged with counts of possession of MDMA.  Rather, when Bent

asked if his consent would "make it so I don't" get another charge, Agent West

answered "No."  Agent West also explained that opening the MDMA-containing

package was all part of the same investigation, and that "at some point, this – we've

got to deal with this.  You know, with a charge or arrest or, you know, whatever.  It

would be a conspiracy charge or a conspiracy to possess a controlled substance."

In other words, Agent West specifically told Bent that "at some point" there would

be a "charge or arrest."  It is incorrect to suggest Agent West coerced Bent into

consenting to the search of the inbound, MDMA-containing parcel.

It is clear the Bent's will was not overborne.  "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991).   "No single criterion controls whether an accused's confession is voluntary."  *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988).  "[T]he presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision. . . [T]he inquiry in each case is whether such a promise overbears a suspect's will . . . either alone or in conjunction with other factors." *Id.*  When assessing the voluntariness of a waiver based on an agents' representations, the Second Circuit distinguishes between an unfulfillable promise or representation and vague promises of leniency for cooperation, the latter of which do not constitute coercion.  *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014); *see also United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) (confession was voluntary after agent conversed briefly with defendant about potential cooperation without specific promises; rather, "the prosecutor and the judge would be made aware of [the defendant's] behavior if it amounted to cooperation.").  "Material misrepresentations based on unfulfillable or other improper promises *might perhaps* overbear a defendant's will.  However, a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law

enforcement officials." *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (emphasis added) (internal citations and quotation marks omitted).

## IV.    CONCLUSION

As explained above, there should be no *Franks* hearing.  Bent has not established that inclusion of the information he claims was lacking from the search warrant affidavits would have altered the determination of probable cause; that information was simply not material.  Furthermore, except for some immaterial errors, Bent can point to no mistakes in the search warrant applications that were the product of bad faith or a reckless disregard for the truth.

With regard to Bent's other issues, hearing evidence will establish that that there was ample evidence to support the reasonable suspicion to justify the extended border search of the two parcels from Spain, and that Djeneba Bent was identified because she came into the East Burke Post Office to pick up a package addressed *to her* at PO Box 22.  Hearing evidence will also establish that Bent's interviews were voluntary, and not the product of law enforcement over-bearing his will.

Respectfully submitted, this 5th day of March, 2019.

UNITED STATES OF
AMERICA

CHRISTINA NOLAN
United States Attorney

By:   /s/ *Michael P. Drescher*
Michael P. Drescher
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Michael.Drescher@usdoj.gov