```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF VERMONT
_____

UNITED STATES OF AMERICA        )

           VS                   )   CASE NO: 5:18-cr-61-1

SAM BENT                        )

_____)        SENTENCING HEARING



BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          CHIEF DISTRICT JUDGE



APPEARANCES:  MICHAEL DRESCHER, ESQUIRE
                   Assistant U.S. Attorney
                   P.O. Box 570
                   Burlington, Vermont   05402
                   Representing The Government



              STEPHANIE M. GREENLESS, ESQUIRE
                   Kaplan and Kaplan
                   P.O. Box 405
                   Burlington, Vermont   05402
                   Representing The Defendant



DATE:        August 2, 2019



         TRANSCRIBED BY:  Anne Marie Henry, RPR
                     Official Court Stenographer
                          P.O. Box 1932
                     Brattleboro, Vermont   05302
```

```
 1              (The Court opened at 10:30 a.m.)
 2              THE CLERK:  Your Honor, the matter before the
 3   Court is criminal number 18-61, United States of America
 4   versus Sam Bent.  Present on behalf of the government is
 5   Assistant United States Attorney Michael Drescher.  The
 6   defendant is present with his attorney, Stephanie Greenless.
 7   And we are here for sentencing.
 8              THE COURT:  All right.  Morning.  Good to see
 9   everybody.
10              MS. GREENLESS:  Good morning.
11              MR. DRESCHER:  Good morning.
12              THE COURT:  Let me start by reviewing everything
13   I've received and make sure I've got everything you
14   submitted.  I have the Pre-Sentence Report, of course.  A
15   memo from the defense with a letter attached from Mr. Bent.
16   A memo from the government.  And I know I read a letter
17   also, I think, from Mr. Bent's mother.  Was that attached to
18   the, the supplemental filing or was that, where did I find
19   that Miss Greenless?
20              MS. GREENLESS:  So there were several letters of
21   support attached as exhibits.
22              THE COURT:  To your sentencing memo?
23              MS. GREENLESS:  Yes, Your Honor.
24              THE COURT:  That's where I had to have read it.
25              MS. GREENLESS:  And then also a few evidentiary
```

```
 1   exhibits.
 2          THE COURT:  I think, did I get everything from
 3   both sides, the two memos?
 4          MR. DRESCHER:  I believe so, yes.
 5          THE COURT:  Sometimes things come in at the last
 6   minute.  And I just wanted to make sure.
 7          The other thing that I can say initially is that
 8   I'll accept the 11(c)(1)(C) agreement from both sides to cap
 9   the sentence at nine years.  I appreciate the efforts that
10   you both made in reaching that understanding.
11          I know that both sides are free to argue for
12   sentences at or below that level.  It's a serious case.  But
13   I didn't think, and I appreciate the government's being very
14   straight up about it, I think the government appreciated as
15   well, it probably wasn't a 14 year case.  So I think the
16   nine year cap is appropriate under the circumstances, an
17   appropriate place to begin the discussions.
18          Mr. Bent, a couple questions for you.  Did you
19   have an opportunity to read the Pre-Sentence Report?
20          MR. BENT:  Yes, I have, Your Honor.
21          THE COURT:  Did you also have a chance to go over
22   it in private with your attorney, Miss Greenless?
23          MR. BENT:  Yes, Your Honor.
24          THE COURT:  Was she able to answer any questions
25   that you had about it?
```

1          MR. BENT:  She was.

2          THE COURT:  Okay.  And, Miss Greenless, are there

3    objections to the Pre-Sentence Report which remains after

4    your discussions with the probation office that the Court

5    needs to resolve?

6          MS. GREENLESS:  Yes.

7          THE COURT:  Why don't we take them up one at a

8    time.

9          MS. GREENLESS:  Would you like me to begin?

10          THE COURT:  Sure.  Mr. Bent, you can probably have

11    a seat.  And I'll turn things over to your lawyer.

12          MS. GREENLESS:  So our first objection relates to

13    the drug quantity found in the PSR and base offense level of

14    26.  So the PSR arrived at the base offense level 26 with a

15    458 kilogram converted drug weight.  A hundred and 56 of

16    that was from converted drug weight that was from a seized

17    net quantity, seized between March 2018, approximately

18    March 13th to April 9th.

19          So our argument is that the -- so there's evidence

20    or the estimate was based on -- the first evidence of any

21    drug, other than marijuana being sold, would be January 18,

22    2018.  And then this hundred and 56 net quantity converted

23    drug weight, multiplying that 156 kilograms by three.

24          So our argument is that there's no evidence that

25    actually supports that additional, it's 244 kilograms of

```
1    converted drug weight, or an amount that could reach the 400

2    kilograms of converted drug weight to reach a base offense

3    level of 26.

4            THE COURT:  So let me push back a little bit and

5    make sure I understand your position.  No question about the

6    accuracy of the 156 --

7            MS. GREENLESS:  No objection to that, Your Honor.

8            THE COURT:  -- kilos, right?

9            MS. GREENLESS:  Yes.  It's the 244 kilograms

10   converted drug weight approximation that we're objecting to.

11   And even a quantity that could reach a base offense level of

12   26.

13           THE COURT:  It would be two more months at the

14   hundred and 56 kilogram rate?

15           MS. GREENLESS:  Two more months of distribution?

16           THE COURT:  That's the PSR's position, right?

17           MS. GREENLESS:  Yes, Your Honor.

18           THE COURT:  156 months for essentially a month,

19   slightly less, but, and then two more periods of a hundred

20   and 56 kilograms?

21           MS. GREENLESS:  Yes, Your Honor.

22           THE COURT:  So, and we know that the month, the

23   converted drug weight wasn't the only product that was

24   moved.  So what would be --

25           MS. GREENLESS:  Yes, Your Honor.
```

1              THE COURT:  -- an alternative way of fairly

2     computing that?

3              MS. GREENLESS:  So I believe that the available

4     evidence should be considered in approximating it.  And the

5     evidence is that Mr. Bent's statements to agents on, I

6     believe, April 9th and 11th that he only had recently

7     started selling the MDMA, LSD and cocaine, and that he

8     predominantly sold cannabis.

9              Also in the attachments to our sentencing memo

10    they show the actual dates that he listed MDMA, cocaine,

11    LSD.  The first time MDMA was listed was January 18th.  It

12    was taken down for sale on March 7th.  So it was a limited

13    time range that it was up prior to the investigation.  That

14    wouldn't equal two months of sale.

15             With cocaine, it was listed sometime after

16    January 19th, according to these listings, online listings.

17    And then it was taken down for sale on March 4th.  So,

18    again, sold less than two months.

19             Then LSD, which would amount to the largest

20    converted drug weight, was listed for the fires time,

21    according to the evidence, on March 2nd.  So for only 12

22    days prior to the start of the investigation when packages

23    started to be seized.

24             And then also when Mr. Bent was being interviewed

25    by agents he gave them access to his computer and all of his

```
 1    marketplace accounts, spending accounts.  And agents were
 2    able to pull a 28 day history from that.  And it shows what
 3    he was selling and quantities.
 4            So that can be used to average approximate
 5    quantities sold of, our position is that they can be used to
 6    approximate quantities sold for that limited period of time
 7    that the -- so the 46 days the MDMA was sold prior to
 8    March 13th.  The four days the cocaine was sold.  And only
 9    12 days of LSD being sold.
10            THE COURT:  What about the autumn of 2017 when we
11    know that financial transactions were occurring?  We don't
12    know much about the drug distribution.  They would just be
13    sort of not taken into consideration?
14            MS. GREENLESS:  Well, I would -- so I think that
15    they can be taken into consideration.  But the only evidence
16    is that he was selling marijuana and hash.
17            THE COURT:  Right.
18            MS. GREENLESS:  And as I pointed out in the memo,
19    Mr. Bent's sentencing memo, if you approximate based on this
20    28 day history, including then the 156 kilograms that we
21    don't object to, to reach a base offense level of 26, the
22    400 kilograms of converted drug weight, there would need to
23    be evidence of a minimum of 111,000 grams of marijuana --
24    well, and then, excuse me.  Let me back up.
25            So if you assume his cannabis sales were
```

1    50 percent hash, marijuana, because that roughly is what the

2    evidence shows, there would need to be evidence of a minimum

3    of a hundred thousand 11 grams of marijuana, 5,560 grams of

4    hash to reach the necessary converted drug weight.  And

5    there just isn't evidence of that.

6           THE COURT:  All right.  While we're on this topic,

7    why don't I ask the government about its objection to

8    converted drug weight and then we can deal once and for all

9    with the drug weight issue.

10          MR. DRESCHER:  With regard to the drug weight, our

11   initial position was that it should be higher than a base

12   offense level of 26.  I will withdraw that objection.  And

13   I'm prepared to defend the reasonableness of the base

14   offense level of 26, the 400 to 700 kilograms of combined

15   drug weight.

16          And there are several reasons why the PSR's, quite

17   frankly, very thoughtful analysis should be the Court's

18   conclusion with regard to drug weight.

19          As Your Honor and Ms. Greenless have recognized,

20   we have 156 kilograms of combined drug weight in hand.  That

21   represents a snapshot of about a month.  We know that the,

22   Mr. Bent's drug sales dated back at least until October when

23   he began his bitcoin laundering for drug proceeds, to which

24   he's pleaded guilty.

25          So we have about a six month period of time when

1  we know, by virtue of his guilty plea, and the undercover

2  bitcoin sales or bitcoin exchange, that he had been involved

3  in drug sales for six months.  So some multiplier on top of

4  the 156 is appropriate.

5            I should emphasize that 156, the 156 kilograms of

6  combined drug weight is what we have in hand.  But I think

7  it would be a mistake to conclude that that was a -- that

8  that amount reflects everything that had happened during

9  that month time period.

10            I have provided the, Your Honor's courtroom deputy

11  with two exhibits that I've shared with Miss Greenless.

12  They are excerpts of Mr. Bent's post-arrest statement.

13            And I would like to, with the Court's permission I

14  would like to refer to these in making and arguing quantity.

15  I don't -- I've shared them with Miss Greenless, I don't

16  know if there's an objection to their use in this context.

17            MS. GREENLESS:  No objection.

18            THE COURT:  Appreciate it.  So 1 and 2 are

19  admitted for the purposes of the sentencing hearing.

20            MR. DRESCHER:  Thank you, Your Honor.  I'm going

21  to start with -- so there are two different exhibits because

22  Mr. Bent was interviewed on two different days.

23            I'd like to start with Exhibit 2, which is the

24  first of his two interviews.  And Mr. Bent admits at lines

25  nine and -- in the first substantive page of Exhibit 2 is

page 93 of that transcript.  And at lines -- the first half

of that page Mr. Bent is talking about the shipping of

packages and his cousin's role in that.

        And Mr. Bent says, beginning at line nine, I mean

sometimes I have 20 or 30 of them going out, meaning

packages, containing his drugs, in one day.

        Now, we have about 90 parcels seized in the course

of just one month.  And that would be a small fraction of

this range of shipping.

        The other part of Exhibit 2 I'd like to emphasize

is a different page of the transcript.  It's page 61 of the

transcript, but the third page of the exhibit.

        And at this point in the interview Mr. Bent admits

to having done approximately 500 dark web drug transactions

on the Dream Dark Web Marketplace.

        And then he estimates that all of his transactions

on the other marketplaces were double digits, not triple

digits.  So he himself admits to at least 500 transactions

on one marketplace alone and then some unspecified quantity

on the other marketplaces.

        The PSR lists what those other marketplaces

consisted of at page 14.  And they are numerous.  There's

the Hansa Marketplace, the Traderoute Marketplace, there's

Arrow, Berlusconi, Wall Street, Zion, Sorcery and others.

        So there are a number of -- that's at paragraph 14

1    of the PSR.  We don't know how many transactions there were

2    from those others, but he admits that there were others.  So

3    we have about 90 transactions in hand.

4         He admits to some quantity of drug transactions

5    that is a significant multiple of 90.  More than five times

6    the 90 we have in hand.  And that's based upon his

7    admissions to law enforcement.

8         Those, you know, I think that would be a

9    reasonable basis for the Court to multiply the 156 by five

10   to get to an amount even above 400 to 700.  In the interest

11   of being conservative, I'm only trying to defend the PSR at

12   this point.

13        Finally, with regard to Exhibit 1, which is a part

14   of the interview that, Mr. Bent's second interview that

15   followed the search of his residence in April of 2018, he's

16   asked at the bottom of the second page of the exhibit, page

17   98 of the transcript, how much cash was sent to you?  He was

18   being asked about how he liquidated his bitcoin drug sale

19   proceeds.  And he explained that he was using the online

20   dark web cash exchange or who went by the moniker of Gold.

21   And he states, beginning at line 24 of page 98, the biggest,

22   the biggest cash out I ever did was $3,000 and that was

23   about three months ago.

24        I emphasize that because we know, by virtue of

25   Mr. Bent's guilty plea, and the evidence, that he actually

1   had a $10,000 cash out using that online, online bitcoin

2   exchanger as alleged in the money laundering, one of the

3   money laundering counts.

4          So on top of his admissions to having had at least

5   500 drug transactions, and on top of his admissions that he

6   would send out 20 to 30 packages a day at times, we also can

7   conclude he was also minimizing at the same time he was

8   making those admissions.

9          Again, that would give the Court an extra basis

10  for concluding it's reasonable to multiply the drugs, the

11  156 kilograms we have in hand.

12         And then on top of that, he was, at the time of

13  the search of Mr. Bent's residence, there was an additional

14  approximately $6,000 of bitcoin that he at that point

15  possessed in his bitcoin wallet that had been seized and

16  it's been administratively forfeited, which is further

17  evidence of drug dealing that is, that is, that should be

18  considered.

19         THE COURT:  All right.  Miss Greenless, anything

20  else to add on that issue?

21         MS. GREENLESS:  Yeah, if I could just respond to a

22  couple things.  So, Mr. Drescher, he mentioned six months of

23  sales.  However, I don't, based on the evidence I don't

24  believe that's correct.  Prior to 2018 he admitted to agents

25  that he was, he was a vender on Hansa, a dark net

1    marketplace.  However, Hansa was taken down in July 2017

2    based on evidence produced by the government.

3            And Mr. Bent told agents that he did not

4    thereafter get back on a vender account on a dark net

5    marketplace until 20 -- several months later, I believe

6    early 2018, late 2017.  So I, without, without any evidence

7    of him actually distributing or on a vender account for six

8    months I, I don't think the Court can find that.

9            And as far as all the vender accounts that the

10   government mentioned in paragraph 14 of the PSR it does list

11   multiple accounts, but it also states that the vender was

12   solely on the Dream Marketplace.  So he was vending solely

13   on the Dream Market, not on all these other accounts.

14           THE COURT:  All right.  Thank you.  I'm going to

15   deny the objection.  I think that the drug quantity

16   calculation is fair.  Nobody contests the calculation with

17   respect to the 156 kilos of converted drug quantity.

18           The question is how to fairly estimate the

19   additional trafficking.  Djeneba Bent reported that she

20   started to help out by mailing packages in January, two

21   months before Mr. Bent was uncovered, and worked for a total

22   of about three months.

23           I think the -- using the base of 156 kilos, and

24   adding two months more of trafficking, likely understates

25   the full scope of the operation, very much for the reasons

1    that Mr. Drescher has identified.  It doesn't account for

2    sales before January of 2018.  It doesn't account for sales

3    during the 156-kilo period that slipped through the, slipped

4    through the net and weren't included.  And it seems to

5    article fairly for the most active period of sales when Sam

6    and Djeneba Bent were working together in the first three

7    months of 2018.

8            So I think it is always in these cases an estimate

9    based on imperfect information.  That's the nature of the

10   process.  But I think this is a fair estimate, conservative

11   in the sense that it, if there's error in it it probably is

12   most likely in favor of the defendant.  So I don't think it

13   overstates the drug quantity.

14           Other objections?

15           MS. GREENLESS:  The firearm enhancement, Your

16   Honor.

17           THE COURT:  Right.

18           MS. GREENLESS:  So I believe our sentencing memo,

19   it meets the clearly improbable standard to avoid the

20   enhancement.  Evidence shows that the rifle as found in

21   Tracy Baker's bedroom, who he was sharing a residence with

22   at the time of the April 9th search.  Not Sam's bedroom.

23   Sam and Miss Baker had broken up several months prior to the

24   search.  And he had been sleeping either on the couch or in

25   his son's bedroom.

1          The rifle was registered in Miss Baker's name.

2   There's no evidence of anyone observing Mr. Bent with the

3   firearm or believing he possessed a firearm.

4          The rifle was not in close proximity to any drugs

5   found in the residence by agents.  The majority of the drugs

6   were obtained in a locked safe in a separate room, with the

7   exception of some, I believe, marijuana that was stored in a

8   freezer.

9          The rifle was found with an attached bayonet,

10  which indicates it was more of a collectable item.  And this

11  might be an assumption, but if a rifle is being used for

12  protection of drug proceeds and profits it would not make

13  sense to attach a bayonet on it.  It would seem to get in

14  the way, if anything.

15         And then also I don't believe that it's -- the

16  rifle is clearly connected to the offense here given the

17  nature of the drug distribution here.  It was all done

18  online in a virtual location where buyers and sellers --

19  well sellers, venders, their identities protected by the

20  anonymous nature of the dark net and crypto currency.

21  Venders do not meet face to face with their buyers or their

22  suppliers.

23         And the packages being sent out also included fake

24  addresses.  So the risk of violence here, or need for

25  possessing a gun, is not present.  So the, I don't believe

1    the policy underlying the enhancement, which, you know,

2    recognizing the increased risk of danger when guns are

3    possessed in drug trafficking is applicable here.

4           THE COURT:  Thank you.  Mr. Drescher?

5           MR. DRESCHER:  Certainly the guideline and the

6    commentary to the guidelines create a sort of presumption

7    that once the firearm is found that there has to be some

8    really compelling evidence that it's unrelated to the drug

9    offense.  I think that is not the case here.

10          It was a loaded assault rifle.  It was in the

11   residence that Mr. Bent was maintaining for the purposes of

12   drug distribution and drug storage.  In the same residence

13   of the assault rifle there were over 700 LSD doses, about,

14   over a hundred and 40 gross weight grams of hash.  More than

15   20 grams net weight of MDMA.  More than 16 pounds of

16   marijuana.  A quantity of mushrooms.  A quantity of cocaine.

17   And that's just a recipe for problems having a loaded gun in

18   the vicinity of distribution, of distribution inventory of

19   drugs.

20          Miss Greenless has argued that because Mr. Bent's

21   drug distribution was an online enterprise that that should

22   somehow disconnect the gun from the drug operation.  And I

23   don't think that makes sense in light of the fact that this

24   is the same residence where the inventory was being kept,

25   the same residence where the packaging was occurring.  And

1    the guidelines create the enhancement because of the

2    dangerous mix of guns and drugs.

3          On top of that Mr. Bent was aware that he was

4    prohibited from possessing a gun.  And for him to, for him

5    to indulge the presence of a loaded gun in the same house,

6    on top of the drug operation, just doesn't add up.  We think

7    the firearm enhancement should apply.

8          THE COURT:  I'll sustain the objection and remove

9    the firearm enhancement.  The firearm belonged to somebody

10   else.  It wasn't, as best we can tell, in close proximity to

11   where Mr. Bent stayed in the house because he and the gun's

12   owner were estranged, at least romantically.

13         The more critical reason I think is that the

14   secrecy and anonymity of the operation made it unlikely that

15   a firearm would be a part of the criminal activity.

16         As I understand how it worked, Mr. Bent never met

17   his suppliers because he met them anonymously on the web.

18   And they didn't want to know who he was and he didn't want

19   to know who they were.  And then, similarly, on the sales

20   side, he sold anonymously and took considerable measures to

21   conceal his whereabouts by driving to various post office

22   boxes and using fake return addresses so that a disgruntled

23   purchaser wouldn't know how to find him.

24         So the nature of the dark web transaction makes it

25   extremely unlikely that there would be the sort of

1    confrontation that we would associate with a sales of drugs

2    out of a known location like a, like a crack house or an

3    apartment.

4            So I think the way it was set up makes it unlikely

5    that somebody else's gun in a different part of the house

6    was, is fairly attributed to this operation.

7            Any other objections?

8            MS. GREENLESS:  No, Your Honor, other than

9    adjusting the total offense level based on the firearm

10   enhancement being removed.

11           THE COURT:  Yes.  That would bring the final

12   offense level from 35 down to 33.  And the range from 135 to

13   168 months.  Is that how you see it as well?

14           MR. DRESCHER:  It is.

15           THE COURT:  And it's still in excess of the

16   stipulated sentencing range under 11(c)(1)(C) agreement, but

17   it's independently necessary and important that the

18   guidelines be calculated fairly.

19           So any other objections that I need to decide?

20           MS. GREENLESS:  No, Your Honor.

21           THE COURT:  There were a couple others that were

22   raised in the report.  And are those waived?

23           MS. GREENLESS:  Yes, Your Honor.  They all related

24   to -- aside from the firearm objection, they related to drug

25   quantity.

1          THE COURT:  Okay.  Mr. Drescher, any further
2    objections that I need to take up from the government's
3    side?
4          MR. DRESCHER:  No.  Thank you.
5          THE COURT:  Okay.  Appreciate it.
6          At the end of the hearing, Mr. Bent, I'll put
7    formal findings on the record which address the guidelines
8    calculations adjusted as we've discussed.  And I'll also
9    speak more broadly about the statutory sentencing factors
10   under the law that guide the Court in all cases, and, in
11   particular, cases like this one which involve a request from
12   both sides for a variance downward from the guidelines.
13          But I'll turn things over to you and Miss
14   Greenless.  I'd be glad to hear from you both in whatever
15   order and in any way you wish to present on the sentencing
16   issues.
17          MS. GREENLESS:  Thank you, Your Honor.  So Mr.
18   Bent is requesting a downward variance from the guideline
19   range and from what's set forth in the plea agreement, the
20   cap.  However, he has reconsidered his position in the
21   sentencing memorandum as far as an appropriate sentence and
22   believes that no more than four years would be appropriate
23   here and based on Section 3553 factors.
24          Mr. Bent, he acknowledges the aggravating factors
25   here, the seriousness of the crime that he committed and the

1   harmful effect of bringing drugs into communities.  But

2   there are aggravating factors here or, excuse me, mitigating

3   factors here that the Court should be aware of, including,

4   first, the very difficult and traumatic childhood he had.

5            His mother and he moved out of their home with

6   their father at a very young age due to the father's cocaine

7   use and physical abuse of his mother.  Starting at the age

8   of just nine years old he was physically abused by his

9   stepfather for several years.  So much so that his injuries

10  put him into the hospital on more than one occasion.

11           He was kicked out of his mother's home around 16

12  years old and left to care for himself for those young

13  years.

14           So I think his childhood helps one understand the

15  criminal, the criminal activity that he got involved in his

16  teenage years that led to the convictions that are set forth

17  in his criminal history.

18           But after that, after those convictions, for the

19  approximately 11 years leading up to instant offense, he did

20  very well.  And he didn't run into any trouble until he

21  broke up with his girlfriend, Tracy Baker.  He and his

22  girlfriend broke up in 2017.  And he made the mistake of

23  turning to drug distribution on the dark net to make some

24  money to move out and independently support himself and his

25  son.

1              And he acknowledges the wrongness of that.  And

2      that is shown by his extraordinary acceptance of

3      responsibility.  From day one he cooperated and helped law

4      enforcement.  He met with them voluntarily on two occasions

5      sharing incriminating and detailed information about the

6      drug distribution involved.  He shared information about

7      in-coming packages of narcotics.  He gave consent to search

8      these packages.  He gave agents access to his computers, all

9      of his dark net accounts, his bitcoin wallet, his passwords.

10     Much of the discovery comes from that in this case.

11             He also spent a large amount of time educating

12     agents on how the dark net works and how the vending on the

13     dark web works.  And for his May 31 arrest he voluntarily

14     surrendered.

15             And since his arrest, and the April 19, April 9th

16     search, he's done very well.  He's turned his life around,

17     in fact.  He has had no violations of conditions while on

18     pre-trial release.  He's been employed for 11 of 13 months

19     he's been out on release.  And for those two months he

20     wasn't, the PSR states that he was actively searching for

21     employment.

22             He, since March 2019, he's been at a supervisor

23     role at his job and has received very high employer reviews.

24     And also he's been financially supporting his wife, her

25     daughter and his son since his arrest.

1              And I don't believe that any more than four years

2    of incarceration is necessary for rehabilitation here.  He's

3    a smart and motivated guy.  You'll see when he speaks to

4    you.  He's got plans to get his degree in business and open

5    up his own computer consulting business, use his skills for

6    good.

7              And also there's already been a couple aspects of

8    punishment involved here, including the $6,000 in bitcoin

9    forfeiture and a $14,000 criminal judgment in the plea

10   agreement.  So we believe that those mitigating factors

11   support a downward variance here.

12             THE COURT:  All right.  Thank you.  Mr. Bent, how

13   do you see things?

14             MR. BENT:  Um, I made a really bad decision.  My

15   decision, you know, the whole purpose of me doing it was so

16   that I could get away from the situation I was in as far as

17   living with my ex.  And it actually, you know, did the

18   opposite because now I'm going to be taken away from them.

19             And looking back on it, it was a foolish thing to

20   do.  I could have just as easily started a legitimate

21   business and done it that way.

22             THE COURT:  If I can interrupt, it can't be an

23   easy thing to figure out how to do?

24             MR. BENT:  So prior to that I actually, I have, I

25   own a computer consulting business.  It's called Worldwide

1   Computer Consultants.  It's a licensed LLC here in Vermont.

2   So I had, I had the ability to do that in the past.  Um,

3   moving out to East Burke it's a lot more rural.  There

4   wasn't that much clients out there.  And the internet was

5   much slower.  So I couldn't do remote desktop support with

6   some of the clients that I had had in the past.  So I lost

7   them.

8        And my want to get out of the situation made me do

9   something that is very foolish at the end of the day.  I

10  hadn't um, I hadn't had a job for a while prior to that.

11  And living in the rural area there wasn't a lot of options

12  out there.  Not that I'm saying that this was one.

13  Obviously, it wasn't.

14        And, you know, it was a very serious crime.  And

15  it's, it's something that, you know, it's going to take its

16  toll, not just on me, because what I did I deserve whatever

17  punishment I get.  But, you know, also my family.  And I

18  think that's one of the worst parts of it, is how it will

19  affect them.  Because 10 years prior to that I spent taking

20  care of them.  And now that's not an option because of what

21  I did.

22        Aside from that, and then to change that and to

23  change the course of my future I've already secured

24  employment for whenever I get out.  My current job will have

25  me back whenever I get out.  And um, I'm looking to get a

1    business degree while I'm in there.  Adam State University

2    allows for correspondence courses.  So I'm going to use the

3    intelligence that I do have for good.  You know, my computer

4    skills, I can still use them.  But, again, you know, in a

5    responsible and legal manner that benefits society as

6    opposed to corrupting it like I was.

7              THE COURT:  All right.  That's a very fair

8    statement.  Thank you.

9              MR. BENT:  Thank you, sir.

10             THE COURT:  Mr. Drescher, how does the government

11   see things?

12             MS. GREENLESS:  Slightly differently than the

13   defense, as to be expected.  Miss Greenless and Mr. Bent

14   have suggested a four year sentence strikes the right

15   balance.  We think a sentence substantially longer would

16   strike the right balance for a handful of reasons.

17             There are some mitigators here, or, I'm sorry,

18   there are some aggravators here that I think are close to

19   unique.  First and foremost is the sophisticated nature of

20   how the crime was committed.

21             Mr. Bent's operational security was impressive

22   using the dark web, using encrypted communications, willing

23   to pay a large premium in an effort to hide his drug

24   proceeds from lawful scrutiny.

25             And folks who deal in controlled substances in

1   this manner are much less likely to be caught than the
2   people who are dealing drugs the old fashioned way.  That
3   being the case, I think the Court's sentence is -- it is
4   especially important that the Court send a general deterrent
5   message to people who might be considering entering into
6   this type of drug dealing operation.
7           On top of that, it's clear that Mr. Bent's motive
8   in the case was not to, was not to help him obtain drugs to
9   which he was addicted.  His motive was profit.  Pure and
10  simple.  And the fact that he did not see his customers face
11  to face I, appears to have created this feeling that the,
12  that the crime might not be as serious or as dangerous.  He
13  didn't have to live with the externalities, the costs of his
14  drug dealing because he wasn't selling drugs to the people
15  on the street block where he lived.  But that doesn't make
16  the drug dealing any less serious.  And he was dealing very
17  serious drugs to include LSD and cocaine.
18          There are some mitigators, to be sure.  We think
19  the nine year cap reflects most of the those.  I'll comment
20  on only one that was mentioned a moment ago.  And that is,
21  Mr. Bent did give interviews to law enforcement on the day
22  of the search of his residence and a couple days later.
23          As I pointed out, earlier in the day there was
24  some minimization in those, in those interviews.  There was
25  some suggestion that he, like, made available to law

1    enforcement his passwords.  Well, as I understand what

2    happened, when the search was executed the computer was up

3    and running.  And law enforcement had access to his computer

4    as they entered into his residence.

5          So it's, the fact that law enforcement was able to

6    identify what, what dark web marketplaces he had passwords

7    for, what dark web marketplaces he had accounts up on, I

8    don't think is something that Mr. Bent should be credited

9    for because of the way the operation played out.

10          Having said that, Mr. Bent did sit down with law

11    enforcement and did provide some background information

12    about what his conduct had been.  And for that he does

13    deserve some credit.  But we think that credit is in the

14    form of the plea agreement that he's entered into already.

15          So our recommendation is that the right sentence

16    is one that approaches nine years that will send an

17    appropriate general deterrent message without being longer

18    than necessary to strike the right balance of the other

19    factors in Section 3553(a).

20          THE COURT:  All right.  Thank you both.

21          Can you remind me, Mr. Drescher, how the

22    forfeiture works so that I have that in mind?

23          MR. DRESCHER:  So there's -- the plea calls for

24    the judgment to include, the sentence to include a

25    forfeiture money judgment in the amount of $14,000.  It's my

1   understanding, I'll confess, I didn't review the rule coming

2   into court today, but it's my understanding that it's, to

3   comply with the rule, the Court's judgment, as it announces

4   sentence today, should -- the Court should take care to

5   include on the record that the sentence will include a

6   forfeiture money judgment in that amount.

7        THE COURT:  And there's a separate seizure of

8   $6,000 which I don't need to be concerned with?

9        MR. DRESCHER:  That's correct.

10        THE COURT:  Okay.  Fair enough.  Thanks.

11        The next thing for me to do is to read the

12   guidelines findings into the record so they have a permanent

13   place in the proceeding.  I'll do that.  I've adjusted them

14   to reflect the removal of the gun enhancement.  They are

15   otherwise as the parties have seen them with their prior

16   discussions with the probation office.

17        MS. GREENLESS:  Your Honor?  Sorry.  I apologize

18   to interrupt.  One thing I should have added earlier when

19   you mentioned any other objections to the PSR, not an

20   objection, but it mentions six open warrants in

21   Massachusetts.

22        THE COURT:  Right.

23        MS. GREENLESS:  Those have all been resolved.  So

24   I'm wondering if the Court can issue an order that it be

25   modified to state so, the PSR be modified.

1          THE COURT:  Yeah.  I spoke before with the

2     probation office.  And I recognize most were resolved.  I

3     think there are two left, but I'll defer to the probation

4     office.

5          PROBATION OFFICERE:  All six warrants have been

6     resolved, Your Honor.  There are two hearings scheduled.

7     One is a violation of probation sentencing.  And one is a

8     pre-trial conference.  But all the warrants have been

9     resolved.

10          THE COURT:  So it's easily done to adjust that in

11     the PSR?

12          PROBATION OFFICERE:  Yes.

13          THE COURT:  That's fair.  Because certainly I

14     wouldn't want the Bureau of Prisons to think at the end of a

15     sentence there were warrants waiting.  Yeah.  Thanks.  We'll

16     do that.

17          Statement of reasons for sentence:  Pursuant to

18     the decisions of the Supreme Court in United States versus

19     Booker and Gall versus United States, and the Second

20     Circuit's Court of Appeals decision in United States versus

21     Crosby, in determining the following sentence the Court has

22     considered the United States Sentencing Guidelines

23     applicable in this case, including all departure authority

24     contained in the guidelines policy statements as well as all

25     of the factors enumerated in 18 U.S.C., Section 3553(a).

1          The Court finds as follows in this case:

2          One, the offense of conspiracy to distribute

3    controlled substances, in violation of 21 U.S.C., Sections

4    846, 841(a), 841(b)(1)(C), occurred between August 2017 and

5    April 2018.  The offenses of money laundering, in violation

6    of 18 U.S.C., Sections 1956(a)(1)(B)(1), occurred on or

7    about September 28, 2017, October 10, 2017 and January 16th,

8    2018.  Hence, the sentencing guidelines apply in this case.

9          Two, counts one, seven, eight, nine group pursuant

10   to Guideline Section 3D1.2(c).

11         Three, the guideline for this group is found in

12   Section 2S1.1 of the Guidelines Manual, the November 1, 2018

13   edition.

14         Pursuant to Guideline Section 2S1.1, the

15   underlying offense guideline, in this case Section 2D1.1, is

16   referenced when determining the base offense level.

17         A., the offense involved between 400 and

18   700 kilograms of converted drug weight.  Therefore, the

19   offense level is 26.

20         B., the defendant distributed controlled

21   substances through mass marketing, resulting in an increase

22   of two levels pursuant to 2D1.1(b)(7).

23         D., the defendant maintained a premises for the

24   purpose of storing, manufacturing, or distributing a

25   controlled substance, resulting in an increase of two levels

1   pursuant to Guideline Section 2D1.1(b)(12).

2           E., the defendant receives an aggravating role

3   adjustment and was directly involved in the importation of a

4   controlled substance, resulting in an increase of two levels

5   pursuant to Guideline Section 2D1.1(b)(16)(C).  The total

6   base offense level is 32.

7           Four, specific offense characteristics under

8   Guideline Section 2S1.1 apply.

9           A., the defendant was convicted of 18 U.S.C.,

10  Section 1956, therefore the offense level is increased by

11  two levels.  The adjusted offense level becomes 34.

12          Five, the defendant was an organizer, leader,

13  manager, or supervisor of the criminal activity, resulting

14  in an increase of two levels.  The adjusted offense level is

15  36.

16          Six, the defendant has demonstrated an acceptance

17  of responsibility for his offense, therefore his offense

18  level is reduced by three levels pursuant to Guideline

19  Section 3E1.1.  The total offense level is 33.

20          The defendant has zero criminal history points,

21  resulting in a criminal history category of I.  The

22  guideline range of imprisonment for an offense level of 33

23  and a criminal history category of I is 135 to 168 months.

24          Eight, the guideline term of supervised release is

25  three years on count one and one to three years on counts

seven, eight and nine.  Since the applicable guideline is in

Zone D of the sentencing table, imposition of a term of

probation is not authorized.

I'll turn from the guideline calculations to the

broader statutory sentencing factors.  I've considered these

factors in seeking to reach a sentencing decision which is

sufficient, but not greater than necessary to comply with

the purposes of the sentence.  I've considered the need for

the sentence to reflect the seriousness of the crime, to

promote respect for the law, and to provide just punishment

for the offense.  The sentence should also deter criminal

conduct and protect the public from future crime by the

defendant and promote rehabilitation.

Let me talk as candidly and directly as I can,

Mr. Bent, with you about the factors under Section 3553.

They are critical to the sentencing decision in this case

because it's not going to be a guideline sentence.  Both

parties have agreed to that.  And so the broader sentencing

factors are really what guide me.

First, the nature and circumstances of the

offense.  The offense is a very serious offense.  I think

everyone here recognizes that on both sides.  I certainly

do.  As I understand your conduct, you started off selling

marijuana over the web in sort of a complex computer

structure and moved quickly to selling many other drugs more

harmful, more dangerous.  And I think what's very fortunate

that the agents, through the sting operation, were able to

catch you because I think this was simply going to increase

in the variety and dangerousness of drugs.  And I'm not sure

that, as you did that, you had a full appreciation of the

harm that drugs like LSD and cocaine can cause to people,

particularly young people who I surmise are most likely to

find you on the dark web.

So it's a serious offense.  And I think it was

kind of increasing in seriousness as time, as time went on.

And that's demonstrated by the involvement of your cousin

and your use of her to mail increasing numbers of packages

from local post offices.

History and characteristics of the defendant.

I'll do my best to speak frankly about the positives and the

negatives.  The negative is, we've already really talked

about.  You are willing to sell dangerous drugs to strangers

all over the United States, whose ages and vulnerabilities

you had no way of appreciating, to make cash.  That's a bad

thing.

On the good side, and on the mitigating side, I

recognize that you have no criminal history for purposes of

the guideline calculations.  That you came out of a

difficult family setting.  That in your teenage years you

were not an easy law abiding type of young man and that you

 1    changed that behavior and became a responsible person.  A

 2    father, a wage earner, a person with considerable

 3    intellectual gifts, particularly in the area of computers,

 4    and that you really overcame a difficult start in life.

 5              And I listened and I understood when you spoke

 6    today about your determination to return to that path.  And

 7    I have real confidence that you mean it and that you can do

 8    it.  And that you have family support here today, and that

 9    they will stay with you.  Your children stay with you

10    regardless, and I trust your spouse will as well.

11              So history and characteristics, looking forward, I

12    would say there's reason for optimism.  And I've taken that

13    into consideration in thinking about a sentence.

14              In many cases I don't talk much about deterrence.

15    Deterrence means trying to make sure that these crimes don't

16    happen again.  It has two aspects.  You know, one is

17    deterring you as an individual.  I think probably your

18    arrest accomplished most of that.

19              MR. BENT:  It did, Your Honor.

20              THE COURT:  I here yeah.  I don't think there's

21    any likelihood that you're going to return.  But there are

22    other young men and women in this sort of hacking and

23    computer savey world who can figure out, like you, how to

24    kind of open the next lands end cite for the sale of drugs.

25    And it's a sort of ingenious crime because all you need is a

1    computer.  You don't need to know people who are selling

2    drugs because they are, as I understand it, online, and you

3    don't need to know your customers because they are online.

4    It's a crime which could be repeated by, you know, by

5    another young person with similar skills and a willingness

6    to let their moral code down.

7              So I think there is a need to impose a sentence

8    which will resonate with other people who are thinking about

9    this.  And I've thought a lot about, this week about where

10   that range for such a sentence would be strong enough to

11   deter others and not unduly punitive in your individual

12   case.  It's a problem.

13             The need to avoid unwarranted sentence disparities

14   among similarly situated defendants means that we try to

15   treat people evenly for similar conduct, not play favorites

16   in court.  And most of the drug distribution defendants whom

17   we see are involved in, all of them I think except, except

18   for you were involved in more hand to hand traditional drug

19   distribution.  And their sentences, when there are not

20   aggravating circumstances with violence or things of that

21   nature, have frequently fallen in the range which the

22   parties have been discussing, about four years, below nine.

23   I think both sides of the Court are all sort of, tried to be

24   consistent in treating, in imposing sentences which reflect

25   a serious attempt to respond to the behavior without kind of

1  ending adult life as you know it.  Leaving room for you and

2  time to recover and move onto a better manner of life.

3          The type of sentences available.  An incarcerative

4  sentence is my only choice.  I think a probation sentence is

5  not appropriate.  Nobody has advocated for it.

6          So I tried to explain my thinking as best I can.

7  I'll impose the sentence.

8          The sentence of the Court is that the defendant is

9  committed to the custody of the Federal Bureau of Prisons

10  for a term of 60 months on counts one, seven, eight, nine,

11  all concurrent.  That means it's a five year sentence.  It

12  runs at the same time on each count.  For a total sentence

13  of 60 months.  To be followed by a three year term of

14  supervised release.

15          And the conditions of supervised release are as

16  follows:  A., you must not commit another federal, state or

17  local crime.

18          B., you must not unlawfully possess a controlled

19  substance.

20          C., you must refrain from any unlawful use of a

21  controlled substance.  You must submit to one drug test

22  within 15 days of release from imprisonment or placement on

23  probation and at least two periodic drug tests thereafter as

24  determined by the Court.

25          D., you must cooperate in the collection of DNA as

1    directed by the probation officer.

2            E., you must comply with the standard conditions

3    of supervision set forth in Part G of the Pre-Sentence

4    Report.  These conditions are imposed because they establish

5    the basic expectations for your behavior while on

6    supervision and identify the minimum tools needed by

7    probation officers to keep informed, report to the Court

8    about, and bring about improvements in your conduct and

9    condition.

10           F., you must submit your person, property, house,

11   residence, vehicle, papers, computers, other electronic

12   communications or data storage devices or media, or office,

13   to a search conducted by a United States Probation Officer.

14   Failure to submit to a search may be grounds for revocation

15   of release.

16           You must warn any other occupants that the

17   premises may be subject to searches pursuant to this

18   condition.  An officer may conduct a search pursuant to this

19   condition only when reasonable suspicion exists that you

20   have violated a condition of supervision and that the areas

21   to be searched contain evidence of this violation.  Any

22   search must be conducted at a reasonable time and in a

23   reasonable manner.

24           I'll state for the record that the sentence is a

25   variance down from the guideline range of 135 to 168 months.

1    The principal basis for the variance is the lack of criminal

2    record.  Of course, that's reflected in the guideline

3    calculation as well.  But in this case, I think it counts in

4    your favor that you overcame childhood difficulties, which

5    were not of your causing, obviously, and a difficult youth,

6    teenage years.  And with the exception of this serious

7    offense, through your own efforts, have made yourself a good

8    citizen and a good member of our society.  And I think that

9    absence of other criminal conduct, and your significant

10   family responsibilities now with children, and your

11   difficult beginnings are a strong reason to vary below the

12   guideline range.

13           The guideline fine range is from $40,000 to

14   $2,500,000.  The defendant has demonstrated no ability to

15   pay a fine, therefore all fines are waived.  A special

16   assessment of $400 is due immediately.

17           And I will state for the record that the Court

18   will impose the agreed upon forfeiture money judgment in the

19   amount of $14,000.  I'll ask Mr. Drescher to submit the form

20   of an order and I will sign it upon receipt.

21           MR. DRESCHER:  Very well.  Will do.

22           THE COURT:  All right.  Thanks.  You have appeal

23   rights, I'll read them aloud.  Both the defendant and the

24   government may have the right to appeal this sentence, as

25   set forth in Title 18, U.S. Code, Section 3742.  If the

1    defendant is unable to pay the cost of an appeal, he has the

2    right to apply for leave to appeal in forma pauperis, and

3    request the Court to appoint counsel for him.

4           If the defendant so requests, the clerk of the

5    court shall prepare and file forthwith a notice of appeal on

6    behalf of the defendant.  Notice of appeal by the defendant

7    must be filed within 14 days of the date judgment is entered

8    on the docket, pursuant to Rule 4(b) of the Federal Rules of

9    Appellate Procedure.

10          Miss Greenless, any request as to location?

11          MS. GREENLESS:  He would like to be as near to his

12   family as possible.

13          THE COURT:  That would probably be Berlin, New

14   Hampshire.  Is that a reasonable choice?  I think there's a

15   camp there too if he qualifies.

16          MR. BENT:  My understanding is that some of the

17   facilities have better educational options.

18          THE COURT:  I'm sure that's true.  And I'll be

19   glad to recommend anywhere that you've heard about.

20          MR. BENT:  I've already looked into it, Your

21   Honor.  Danbury in Connecticut seems to have really good

22   vocational training and things along those lines.

23          THE COURT:  All right.  So I'll recommend

24   placement at Danbury.

25          Mr. Drescher, what is the government's view as to

1  self-surrender?

2          MR. DRESCHER:  In light of Mr. Bent's compliance

3  since his arraignment in this case we don't object to him

4  being allowed to self-surrender.

5          THE COURT:  All right.  You have a court date,

6  remind me, in Massachusetts.  When is that?

7          MR. BENT:  I believe it was in September.  Um, I

8  have it written down at home.

9          THE COURT:  I think Miss Greenless knows

10          PROBATION OFFICERE:  September 12th, Your Honor.

11          THE COURT:  September 12th.  So, and you plan to

12  keep that?

13          MR. BENT:  Um, so when I had my warrants removed

14  the other day my lawyer had told me that he had gotten an

15  amendment when -- so my presence was waived.  So that the

16  sentence would commence without me actually having to be

17  there because the Court down there was aware that I was

18  awaiting a federal sentence.

19          THE COURT:  Okay.  All right.  So how about we

20  give you 30 days to get your affairs in order?

21          MR. BENT:  Thank you, Your Honor.

22          THE COURT:  Where would that bring us?

23          THE CLERK:  Self-report date would be Tuesday,

24  October 1st before 2 p.m..

25          THE COURT:  The probation office can help you with

```
 1   the details.
 2              MR. BENT:  Okay.  Thank you.
 3              THE COURT:  Miss Greenless, anything else from
 4   your side?
 5              MS. GREENLESS:  No, Your Honor.  Thank you.
 6              THE COURT:  Mr. Drescher?
 7              MR. DRESCHER:  Your Honor, I move to dismiss the
 8   remaining counts of the indictment, which are counts two
 9   through six and count 10.
10              THE COURT:  Granted.
11              I would just say this, Mr. Bent, I know it's not
12   an easy day for you.  But I look forward to welcoming you
13   back to the community after you've completed your sentence.
14   You are clearly a gifted person in many respects.  And I
15   look forward to, I'm not often in East Burke, but if you
16   catch sight of me in Burlington I hope you'll march right up
17   and say hello and introduce me to your son or your wife,
18   whoever is with you.  The time I really don't want to see
19   you again would be back in a federal courtroom on a
20   violation.  I'm sure that's not going to be an issue.
21              MR. BENT:  That won't happen, Your Honor.
22              THE COURT:  Okay.  Fair.  Good luck with things.
23   Okay.
24              MR. BENT:  Thank you, Your Honor.
25              THE COURT:  Thank you both.  I appreciate your
```

1    help very much, both of you.

2              MR. DRESCHER:  Thank you.

3              The Court recessed at 11:46 a.m.)

1                  C E R T I F I C A T E

2

3          I, Anne Marie Henry, Official Court Reporter for

4    the United States District Court, for the District of

5    Vermont, do hereby certify that the foregoing pages are a

6    true and accurate transcription of my shorthand notes taken

7    in the aforementioned matter to the best of my skill and

8    ability.

9

10                    *Anne Marie Henry*

11                    Anne Marie Henry, RPR
                      Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25